**William David HENSLEY, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Respondent.**

No. 79–2552.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1980.

Decided March 17, 1981.

---

Carolyn McKenney, Washington, D.C., with whom Joseph H. Koonz, Jr. and Roger C. Johnson, Washington, D.C., were on the brief for petitioner.

Richard W. Turner, Washington, D.C., with whom Daniel V. S. McEvily, Washington, D.C., was on the brief, for respondent.

Before MacKINNON and WALD, Circuit Judges, and JUNE L. GREEN *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting Opinion filed by Circuit Judge MacKINNON:

WALD, Circuit Judge:

█ Petitioner William Hensley appeals a decision and order of the Benefits Review Board of the United States Department of Labor which upheld a denial of his compensation claim brought under the Longshoremen's and Harbor Workers' Compensation Act (the "Act"), 33 U.S.C. § 901 *et seq.*[1] Hensley claims a temporary, total disability due to psoriasis which, he alleges, was aggravated by his employment as a bus driver for the Washington Metropolitan Area Transit Authority ("WMATA"). An Administrative Law Judge found that the aggravation of Hensley's pre-existing psoriatic condition was not work related. Appendix ("App.") at 16–19. The Benefits Review Board, in a 2–1 decision, affirmed the finding of the Administrative Law Judge, holding that there was substantial evidence to support his decision. App. at 1–15. Because the Benefits Review Board and the Administrative Law Judge erred in evaluating the evidence before them, and therefore failed properly to apply the statutory presumption favoring the claimant in a case where no substantial evidence was present-ed to contradict his claim, the decision is reversed.

## I. THE FACTS

Petitioner Hensley, husband and father of seven children, has been a bus driver for the past 33 years, employed for that entire period by respondent WMATA or its predecessor, D.C. Transit Authority. Since 1968 Hensley has been plagued by general psoriasis. Until August, 1977, however, his condition was well controlled by medication, and he never missed a day of work due to his skin condition. App. at 103. Hensley testified before the Administrative Law Judge that during June and July of 1977, his bus route came under construction, making the ride extremely rough.[2] App. at 103–04. He further stated that the particular bus assigned to his route had very poor suspension, an uncomfortable driver's seat, and a steering ratio requiring far greater effort for turns than other buses used by WMATA; all of this was acknowledged to be true by the Board. *Id.* at 3 n.3; 104–06. Hensley testified that he was therefore exposed to severe bouncing at certain points of contact, especially his left hand, the small of his back, the underside of his thighs, and his feet. *Id.* at 106–08.

> [D]uring the course of this time my skin began to dry out and peel and crack; and it was very hard for me—in other words, it would hurt to hold the steering wheel. And I was trying to drive with a thumb and finger proposition [sic]. But when I would grip the wheel and be out there on the job for a while, then it would crack open and bleed from the work, from doing the job, from holding the steering wheel; it would actually crack open and my hand would bleed.

*Id.* at 108.

On August 15, 1977, Hensley ceased work on the advice of his treating physician, Dr. Donald Mitchell. Dr. Mitchell found peti-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The Act's provisions are applicable to employers in the District of Columbia pursuant to 36 D.C.Code § 501 *et seq.*

2. Hensley testified, "[I]t just shook the heck out of your hands. It could even break your arm almost." App. at 107.

tioner to be in severe pain and unable to use his hands and feet; his psoriasis was extensive with pustular lesions on the palms and the soles of his feet. App. at 30–3. Hensley was started on medication and he returned to work on August 23, 1977, despite advice from Dr. Mitchell that his condition would worsen if he began driving again. *Id.* at 49. But on September 5, 1977, Hensley was forced to stop work again due to the condition of his hands and feet, and he remained off work until November, 1978. Once Hensley stopped working, his condition stabilized. *Id.* at 111.

## II. THE LAW

■ This court's role in reviewing determinations of the Benefits Review Board under the Longshoremen's Act is limited. We examine the record only to assure that the Board's orders rest on substantial evidence on the record as a whole, and that the Board's underlying standards for granting or denying compensation are in accord with the law. *See Wheatley v. Adler,* 407 F.2d 307, 310 (D.C.Cir.1968) (en banc). We have not hesitated, however, to reverse the Board's orders when they fail properly to apply the Act's presumption favoring claimants in disputed cases. *See, e. g., Riley v. U. S. Industries/Federal Sheet Metal, Inc.,* 627 F.2d 455 (D.C.Cir.1980), *cert. granted,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1981); *Swinton v. Kelly,* 554 F.2d 1075 (D.C.Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976); *Wheatley v. Adler, supra.*

The Act provides that compensation shall be payable when an employee covered under the Act suffers an "injury," defined as "accidental injury . . . arising out of and in the course of employment . . . ." 33 U.S.C. § 902(2). Section 20 of the Act further provides that "[i]n any proceeding for the enforcement of a claim for compensation under this chapter *it shall be presumed, in the absence of substantial evidence to the contrary—(a) That the claim comes within the provisions of this chapter.*" 33 U.S.C. § 920 (emphasis supplied). The Section 20 presumption is but one indication of the

"humanitarian nature" of the Act generally, *O'Keefe v. Smith, Hinchman & Grylls Assoc., Inc.,* 380 U.S. 359, 362, 85 S.Ct. 1012, 1014, 13 L.Ed.2d 895 (1965), and the "beneficent purposes" which underlie it. *Friend v. Britton,* 220 F.2d 820, 821 (D.C.Cir.), *cert. denied,* 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. 745 (1955).

■ The presumption operates in favor of the claimant unless and until "substantial evidence" is presented by the respondent showing that the claimant's malady did not arise out of and in the course of his employment. At that point, the presumption "falls out of the case." *Del Vecchio v. Bowers,* 296 U.S. 280, 286, 56 S.Ct. 190, 193, 80 L.Ed. 229 (1935); *Swinton v. Kelly, supra,* 554 F.2d at 1082 n.35; *Maryland Shipbuilding & Drydock Co. v. Jenkins,* 594 F.2d 404, 407 (4th Cir., 1979); *St. Louis Shipbuilding Co. v. Director, Office of Workers' Compensation Programs,* 551 F.2d 1119, 1124 (8th Cir., 1977); *Travelers Insurance Co. v. Belair,* 412 F.2d 297, 301 n.6 (1st Cir., 1969). This circuit has not decided whether, once the presumptive "bubble" bursts and falls out of the case, the ultimate burden of persuasion as to work-relatedness rests with the employer or employee. *Cf. Parsons Corp. of California v. Director, Office of Workers' Compensation Programs,* 619 F.2d 38, 41 (9th Cir., 1980) ("Even after the substantial evidence is produced to rebut the statutory presumption, the employer still bears the ultimate burden of persuasion."). But many courts, including our own, have decided that the beneficent purposes and humanitarian nature of the Act must be borne in mind when deciding whether the employer has presented "substantial" evidence; thus doubtful questions, including factual ones like work-relatedness, must be resolved in favor of claimants. *Wheatley v. Adler, supra,* 407 F.2d at 313–14 ("We have frequently pointed out that since the statute 'should be construed liberally' in favor of employees and their dependents, it is 'in their favor [that] doubts, including the factual, are to be resolved.' *This approach has . . . characterized our application of the substantial evidence test*

*in these cases."* [emphasis supplied]). *See also Swinton v. Kelly, supra,* 554 F.2d at 1084–85 (citing numerous cases); *Ryan-Walsh Stevedoring Co. v. Trainer,* 601 F.2d 1306, 1316 (5th Cir. 1979); *Army & Air Force Exchange Service v. Greenwood,* 585 F.2d 791, 794 (5th Cir., 1978); *Bath Iron Works Corp. v. White,* 584 F.2d 569, 574 (1st Cir., 1978); *Young & Co. v. Shea,* 397 F.2d 185, 188, *rehearing en banc denied,* 404 F.2d 1059, 1061 (5th Cir. 1968), *cert. denied,* 395 U.S. 920, 89 S.Ct. 1771, 23 L.Ed.2d 237 (1969) ("The policy of the Act that all doubtful questions are to be resolved in favor of the [claimant] is to be considered in determining whether there was substantial evidence before the Commissioner." 404 F.2d at 1061). Applying this approach, this court has often found it necessary to reverse orders which are based on evidence too insubstantial to override the statutory presumption; we "will not sustain the administrative findings merely because they are substantiated by some isolated evidence." *Friend v. Britton, supra,* 220 F.2d at 821. *See, e. g., Swinton v. Kelly, supra,* 554 F.2d at 1085 n.61 (collected cases decided in this circuit). On the contrary, in order to overcome the presumption, the employer's "substantial evidence" must be "specific and comprehensive enough to sever the *potential* connection" between the disability and the work environment. *Id.* at 1083 (emphasis supplied); *Parsons Corp. of California v. Director, Office of Workers' Compensation Programs, supra,* 619 F.2d at 41.

## III. THE LAW APPLIED IN THIS CASE

■ It is uncontested that Hensley's severely aggravated psoriasis condition is an "injury," as that term is used in the Act; further, under the well recognized "aggravation rule" it is indisputable that "an aggravation of a pre-existing condition may constitute a compensable accidental injury under the Act[.]" *Wheatley v. Adler, supra,* 407 F.2d at 312. *See Director, Office of Workers' Compensation Programs v. Brandt Airflex Corp.,* 645 F.2d 1053, at 1057 (D.C.Cir.1981); *Friend v. Britton, supra,* 220

F.2d at 823; *Robinson v. Bradshaw,* 206 F.2d 435, 437 (D.C.Cir.), *cert. denied,* 346 U.S. 899, 74 S.Ct. 226, 98 L.Ed. 400 (1953); *Ridgley v. Ceres, Inc.,* 594 F.2d 1175, 1177 (8th Cir. 1979). The fact that other, nonemployment related factors may also have contributed to, or additionally aggravated Hensley's malady, does not affect his right to compensation under the "aggravation rule." *Cordero v. Triple A Machine Shop,* 580 F.2d 1331, 1335 (9th Cir. 1978), *cert. denied,* 440 U.S. 911, 99 S.Ct. 1223, 59 L.Ed.2d 459 (1979); *see Wheatley v. Adler, supra,* 407 F.2d at 312 n.11 (" '[T]he cases almost invariably decide that the fact that the injury would not have resulted but for the pre-existing disease, or might just as well have been caused by a similar strain at home or at recreation, are both immaterial.' ")

Thus, the only issue in this case is whether or not the *aggravation* of Hensley's psoriasis, which occurred during July and August of 1977 when potholes and construction on his route made driving particularly stressful, arose *even in part* "out of and in the course of" his employment. 33 U.S.C. § 902(2). This statutory language

> *does not require "a causal relation between the nature of employment of the injured person and the accident. . . .* All that is required is that the 'obligations or conditions' of employment create the 'zone of special' danger out of which injury arose." . . . [The line is drawn] only at cases where an employee [has] become "so thoroughly disconnected from the service of his employer that it would be entirely unreasonable to say that injuries suffered by him arose out of and in the course of his employment."

*O'Keeffe v. Smith, Hinchman & Grylls Assoc., Inc., supra,* 380 U.S. at 362, 85 S.Ct. at 1014 (emphasis supplied). *See, e. g., Mitchell v. Woodworth,* 449 F.2d 1097 (D.C.Cir. 1971) (denial of compensation reversed despite apparent absence of evidence that death arose from any particularly unusual work related stress); *Butler v. District Parking Management Co.,* 363 F.2d 682 (D.C.Cir.1966) (denial of compensation re-

versed despite apparent absence of any particularized causal theory connecting claimant's mental breakdown with his 20 years of service as a parking lot attendant); *Robinson v. Bradshaw, supra* (denial of death benefits reversed for failure to apply presumption to issue of work-relatedness in case where deceased suddenly became obsessed with idea that he was being pursued by mob, resulting in his confinement in jail, where he was thereafter fatally shot by police officer whom he attacked; presumption applied that his job as a truck driver aggravated some pre-existing mental illness).

In deciding whether the aggravation of Hensley's psoriatic condition arose, even in part, out of and in the course of his employment as a bus driver, the factfinder was required to apply the Section 20 presumption in his favor. *Swinton v. Kelly, supra,* 554 F.2d at 1082 ("The statutory presumption applies as much to the nexus between an employee's malady and his employment activities as it does to any other aspect of a claim." Numerous cases cited); *see Riley v. U. S. Industries/Federal Sheet Metal, Inc., supra,* 627 F.2d at 458; *Ridgley v. Ceres, Inc., supra,* 594 F.2d at 1177.

■ Hensley's allegation of work-relatedness, however, did not rest solely on the statutory presumption; on the contrary, he presented testimony on work-relatedness which overwhelmingly supported his claim.

Hensley testified that after 32 years of driving a bus—10 of them with chronic psoriasis but not a day's work lost because of the condition—his psoriasis flared up so badly in the summer of 1977 that he was forced to quit work on his doctor's advice. This was precisely the time when construction began on his route. He also testified that the lesions first appeared on those parts of his body where the physical trauma of driving was most concentrated, his left hand, his lower back and buttocks, and his right foot.[3] App. at 106–08. While driving the bus his hands would "crack open and bleed . . . from holding the steering wheel." *Id.* at 108. Then, when he stopped working, his condition improved; when he returned again, it worsened. All this was *uncontradicted* testimony, and by itself should have been sufficient evidence to show work-relatedness. *See Eller and Co. v. Golden,* 620 F.2d 71, 74 (5th Cir. 1980) (claimant's own testimony may constitute substantial evidence justifying award of compensation under the Act).

In addition to Hensley's testimony, however, two accredited dermatologists, one of whom was actually treating Hensley's psoriasis at the time he had to stop work, stated that in their expert medical opinion the flare-up was, or certainly could have been, aggravated by Hensley's driving a bus.[4] The principal treating physician, Dr.

---

3. The dissent makes much of the fact that by the time the company's doctor examined him *nine months later,* he had lesions all over his body. It is entirely consistent with the pattern of psoriasis that the emotional stress caused by the appearance of some lesions in one area precipitates lesions in other areas as well. Thus a person may simultaneously have some lesions that are a result of Koebner's syndrome, *i. e.,* caused or aggravated by physical trauma, *see* nn.4, 11 *infra,* and others that are not. *See generally* 6 P. Cantor, *Traumatic Medicine and Surgery for the Attorney* 640–41 (1962).

4. Dr. Mitchell stressed repeatedly in his deposition that he felt claimant's underlying condition was aggravated by the conditions of his employment:

> Q. Doctor, do you have an opinion that you can state with reasonable degree of certainty as to whether or not Mr. Hensley's work as a bus driver aggravated his underlying condition of psoriasis?
> A. Let me preface my statement by saying, I don't think Mr. Hensley's psoriasis is due to his driving a bus, but I certainly think that Koebner's phenomenon plays a part in this, *and that this is service-aggravated,* as we used to call it in the Army.
> Q. So his work did not cause the psoriasis *but it certainly did aggravate the condition?*
> A. *Oh, yes.*
>
> App. at 31–2 (emphasis supplied).
>
> Q. Let me ask just one or two more questions, Doctor. Then the occupation of driving a bus for this particular man, you think that his hands were affected by gripping the wheel?
> A. Yes, that's right.
> Q. You mean by that that some of the roughening skin of the lesions on the hands were rubbed to some extent?

Mitchell, testified that he advised Hensley at the time to stop working, warning that the condition would worsen if Hensley continued to drive. When Hensley persisted in staying on the job, the condition did worsen; when he finally stopped for good, it stabilized and improved somewhat. App. at 31–3, 36, 49, 111. Dr. Mitchell also corroborated many particulars of Hensley's testimony, for example, that the pustular lesions on Hensley's hands and feet were more severe than the lesions on the rest of his body,[5] id. at 48, and that his left hand was more severely affected than his right, id. at 56.[6]

In sum, Dr. Mitchell's overall testimony was consistent with at least two theories of work-related aggravation, namely, that pustular lesions appeared initially as a response to the physical trauma of driving, or that driving aggravated existing lesions to the point that they cracked, bled and made driving impossible. It is possible both things happened. In either case, work-related aggravation of an underlying psoriatic condition is clearly established on this record. It is, frankly, difficult for us to discern how the Administrative Law Judge and the Benefits Review Board could deny his claim based on this evidence, especially

> A. No, I think what occurred was this man—and in psoriasis, you can never generalize to every patient, because every patient with psoriasis is slightly different—*I think the constant trauma of gripping and driving the bus made him worse.*
> Now, if he had been a carpenter, using a hammer and a saw, I think it would have gotten worse from using a hammer and a saw.

App. at 52 (emphasis supplied).

> Q. I just have two questions, Doctor. Dr. Mitchell, you have testified that *the constant trauma of gripping the steering wheel made Mr. Hensley's condition worse?*
> A. *Yes.*

App. at 56 (emphasis supplied). *See also* Letter of Dr. Donald Mitchell, App. at 155 ("This condition is work aggravated as is demonstrated by the extensive psoriasis involving the palms and soles.").

> Dr. Thomas P. Nigra, M.D., to whom claimant was referred by Dr. Mitchell, said:
> When I saw him, he had physically disabling psoriasis of his left hand. He is a Metro Bus

when the statute as construed by our court and others, *see* cases cited at pp. 267–268, 269, *supra,* presumes causality "in the absence of substantial evidence to the contrary." 33 U.S.C. § 920.

■ We can find no *substantial* evidence to the contrary in this case. The only evidence adverse to Hensley that appears in the record is the testimony of Dr. Robert Stolar, hired by WMATA, who examined Hensley only once with regard to his claim. This examination took place *nine months after the flare-up and eight months after he left work.* The WMATA doctor's conclusions were as follows:

> In my experience the pattern of work that he carried on does not produce psoriatic lesions by the only known traumatic mechanism which I mentioned for the Koebner phenomena, which would require a different type of injury than what I could visualize that he received at any time.... So in attempting to visualize Mr. Hensley's constant work pattern, his constant frictional pattern was of the smoothing or sliding variety, which is used very often as part of the treatment for psoriasis. So I could not visual-

driver, and there is little question that he uses his hands in his work.
> Psoriasis is a capricious disease which waxes and wanes and comes and goes without cause. However, we definitely do know that trauma to an area of skin in a patient who has extensive psoriasis will result in a flare of psoriasis in the traumatic area. It is my opinion that using his hands in his work the way Mr. Hensley does as a bus driver could result in trauma and therefore flaring of his basic condition.

App. at 154.

5. Contrary to the dissent's contention, Diss. Op. at 2, pustular lesions *are* blister-like and Dr. Mitchell testified that gripping a wheel can cause blisters, and blisters, in turn, signify a dermal injury which can give rise to Koebner's syndrome. *See* n.11 *infra.*

6. Hensley testified that he had to do most of the gripping of the wheel and steering with his left hand, while his right hand remained free to open and close doors and to service customers. App. at 101–02, 107.

ize that particular pattern of injury that would aggravate his condition.

App. at 73–4.[7]

This testimony does not constitute substantial evidence contradicting claimant's theory of work-relatedness. The WMATA doctor's "experience" that bus driving would not "*produce* psoriatic lesions" (emphasis supplied) in no way contradicts the claimant's or his own doctors' testimony that gripping the wheel and pressing the accelerator and brakes *aggravated existing pustular lesions* on his hands and feet to the point where he could not drive.[8] Indeed the Board itself called the WMATA doctor's testimony on this basic issue in the case "not crystal clear." App. at 7.

■ More importantly, however, there is no evidence in the record that this third doctor had any particular experience or knowledge upon which to base his opinion regarding Hensley's "work pattern" as a bus driver, or his opinion regarding the "constant frictional pattern" to which Hensley was subjected on his particularly rough bus route during July and August of 1977. Dr. Stolar, while an accredited dermatologist, was not shown to have had any experience from which to estimate what sort of trauma Hensley was receiving from driving on his particular bus route, or which parts of the body received stress from such driving. At one point the Administrative Law Judge had to point this out:

Judge Giesey: Counsel, Dr. Stolar is an impressively credentialed member of a learned profession; but I do not think this is part of what he learned. I know as much about driving as the Doctor does . . .

App. at 84. Therefore, since this doctor's ultimate opinion on work-relatedness was based entirely upon his "visualiz[ation]" of the kind of physical trauma involved in Hensley's job, and since this "visualiz[ation]" was not derived from any particular experience or knowledge,[9] we find that Dr. Stolar's opinion on the issue of aggravation is not entitled to the "substantial" weight which it must have to overcome the Congressionally mandated presumption. Hensley's claim should therefore have been sustained on the strength of that presumption, together with the evidence of his two treating physicians and his own testimony.

## IV. THE DECISIONS OF THE ADMINISTRATIVE LAW JUDGE AND THE BENEFITS REVIEW BOARD

■ Given our conclusion that there was not "substantial" evidence to overcome the presumption of causality or the supporting evidence of claimant and his medical witnesses, we must conclude that the Administrative Law Judge erred in finding that "the weight of substantial evidence preponderate[d] on the side of non-exacerbation." App. at 19. In fact, the Administrative Law Judge's reasons for denying the claim are well nigh indecipherable to us. The

---

7. At the time he first examined him, Dr. Stolar wrote to the WMATA lawyer:
   There is no question that Mr. William D. Hensley has an unfortunate and to a great extent disabling condition of psoriasis; however, in attempting to evaluate it from his history and examination, *I was unable to determine that it was work related or work aggravated.*
   App. at 160 (emphasis supplied). Needless to say, the doctor's *inability to determine* that Hensley's condition was work-related does not satisfy the employer's burden of showing with substantial evidence that his condition *was not* work-related.

8. Ironically, Dr. Stolar testified that if Hensley had been his own patient, he too "probably would have stopped him from work long before, and tried to clear his skin." App. at 83.

But if Dr. Stolar really believed that work did not aggravate his condition, there would be no reason for such advice.

9. The WMATA doctor's "visualiz[ation]" of Hensley's physical trauma as being "of the smoothing or sliding variety" was contradicted by the only witness whom the record shows had *actual knowledge* of the driving conditions: Hensley himself. If there was any question about Hensley's description of the physical trauma he underwent on the route, surely it would have been incumbent upon WMATA to produce a witness to contradict that description. WMATA must be presumed to have at its disposal witnesses who can testify as to the stresses its drivers are subjected to on its bus routes.

Review Board itself admitted that his analysis was "not a model of clarity." App. at 11 n.8. He reasoned thus: [10]

> [T]he treating physician testified that Koebner's phenomenon is produced only by injuries that penetrate the epidermis and injure the dermis but that "it's well established that the mild, repeated trauma to the knees and elbows of patients accounts for the characteristic distribution of psoriasis, and this is a form of Keobner's phenomenon." Aside from the internal inconsistency of this testimony, photographs submitted in evidence with his report show that, while Hensley's elbows have extensive psoriatic lesions, his knees are clear and uninvolved—despite the fact that his work is largely performed in a seated position and at least one leg, according to Hensley, "does all the work." Ironically, this physician's patient's condition is significantly inconsistent with the premise upon which the entire theory of causation is based.

App. at 19. Our reading of the record reveals that the Administrative Law Judge badly misunderstood the import of the treating physician's testimony. There is nothing whatsoever inconsistent in Dr. Mitchell's conclusion that "mild, repeated trauma" which may come from "gripping a wheel of a bus" could produce a dermal injury likely to incite Koebner's syndrome.[11] Dr. Mitchell's testimony was not only internally consistent, but it also significantly bolstered claimant's theory of work-relatedness. The remainder of the Administrative

---

10. Prior to arriving at his "Findings of Fact and Conclusions of Law," *see* text immediately *infra*, the Administrative Law Judge cited Hensley's testimony that the streets on his route were "chopped all to pieces," that the "bus assigned his route had notably poor suspension," and that as a result "various parts of his body were 'banged,' . . . he was 'continually bouncing,' and [the] driving 'shook the heck out of [his] hands'. . . ." App. at 17. The Law Judge then summarized the three doctors' testimony, and concluded by noting that Dr. Stolar "stated . . . that rubbing, smoothing or abrasion such as encountered in Hensley's work is a part of the treatment for psoriasis, rather than an exacerbating influence." *Id.* at 18. The Administrative Law Judge's account of Dr. Stolar's testimony appears to assume—as did Dr. Stolar—a "rubbing, smoothing" effect from driving that is completely at odds with Hensley's first-hand account of what he was undergoing.

Furthermore, it is incorrect to assert that "rubbing, smoothing, or abrasion" *per se* constitutes a treatment for psoriasis, particularly if the "rubbing, smoothing or abrasion" is neither medically prescribed nor administered as in Hensley's case. Dr. Stolar testified that one particular form of treatment for psoriasis involves using a polyester fiber sponge "to get rid of the scale, so that *medication which is applied* can be better absorbed and be much more effective." App. at 75 (emphasis supplied); *accord*, App. at 35–6 (testimony of Dr. Mitchell). Since Hensley's exposure to banging, bouncing and shaking was not part of any prescribed medical treatment involving medication and special sponges, his situation is far different from the one outlined in Dr. Stolar's testimony.

11. The Administrative Law Judge was probably referring to the following portion of Dr. Mitchell's deposition:

> Q. This Koebner's syndrome or phenomenon of which you spoke a while ago, you used the illustration of a pin scratch, I believe.
> A. Yes.
> Q. Is that correct? And in order to produce this phenomenon, you must at least scratch below the first layer of skin, must you not?
> A. Below the first several layers of skin. You must go entirely through epidermis, and injur [sic] the dermis.
> Q. So that simply gripping a wheel of a bus, using your hands in that manner, doesn't produce scratches, does it?
> A. Oh, haven't you ever driven a car as much as I have? I have had blisters on my hands from driving an automobile. I had a little sports car; I had to change the steering wheel because it produced blisters every time I drove the thing. . . .
> Q. That produced blisters, but it didn't cut your hands, did it?
> A. No, but when you produce a blister, you have got a dermal problem.

App. at 40–1. Needless to say, this testimony is not at all inconsistent with another illustration of the Koebner phenomenon which Dr. Mitchell provided at another point in his deposition: that "it's well established that the mild, repeated trauma to the knees and elbows of patients accounts for the characteristic distribution of psoriasis, and this is a form of Koebner's phenomenon." *Id.* at 35. In fact, Dr. Mitchell's testimony was clear and unambiguous on the issue of whether the aggravation of Hensley's psoriasis was work-related. *See* n.4 *supra*.

Law Judge's reasoning, which relies on the absence of aggravated psoriasis on Hensley's knees, is simply irrelevant; Hensley's claim was that his hands and feet, not his knees, were significantly involved in the driving.[12] Thus the Administrative Law Judge's final conclusion that Hensley's condition was inconsistent with his "entire theory of causation" is simply a *non sequitur*.[13]

Although the Benefits Review Board in large part disclaimed reliance on the Administrative Law Judge's reasoning, calling it "puzzling," it concluded nevertheless that his reasoning did not "so undermine the . . . ultimate finding so as to require reversal." App. at 11 n.8. Yet the Board itself engaged in equally murky thinking, relying on alleged facts which were irrelevant to the issue in this case, and failing to apprehend the thrust of the testimony on work-relatedness.

■ As to the former, the issue here has always been clear: whether the physical trauma of driving under unusually difficult circumstances contributed to the aggravation of Hensley's already present psoriatic condition. The Board's opinion, however, highlighted other factors such as obesity and emotional problems which could have contributed to the flare-up, App. at 6, though no one testified that they did so in fact. In this way the Board ignored decisions of this circuit and others, *see* p. 268, *supra*, which require a presumption in favor of job-relatedness where multi-causation may exist, and no substantial evi-

dence is introduced demonstrating that non-work related factors are the only causes. The Board also cited the fact that claimant had lesions on parts of his body not subjected to work pressure, *i. e.*, his ankle and stomach. Such lesions are entirely consistent with the "capricious" nature of the disease—a flare-up in one portion of the body can, without apparent cause, spread to other parts. *See* n.3 *supra*. Finally, the Board relied upon the fact that the condition was still "severe" several months after he stopped driving, but ignored the undisputed evidence that his condition stabilized when he stopped driving the bus. *See* pp. 269–270 *supra*.

In addition to all this, the Board also apparently misunderstood the testimony concerning work-relatedness. Claimant testified that by gripping the wheel of the bus the psoriasis on his hands was traumatized to the point of bleeding. His physician, Dr. Mitchell, corroborated the testimony that he had pustular lesions on his hands and feet, App. at 30. These lesions constituted a dermal injury giving rise to a diagnosis of Koebner's syndrome, one form of which occurs when "mild, repeated trauma" penetrates the dermal level of the skin causing a flare-up in the psoriatic patient's condition. *See* App. at 34–5. Dr. Nigra's statement was consistent with Dr. Mitchell's regarding this causal scenario. *See* n.4 *supra*. But the Board chose to rely not upon this evidence, but instead upon the testimony of the WMATA doctor,[14] and found that he

12. The Board itself admitted that the Administrative Law Judge's "stressing of the fact that claimant's knees were not affected by psoriasis is puzzling in light of the fact that claimant's knees did not appear to be subject to repeated trauma." App. at 11 n.8.

13. There is little doubt in our minds that even if the Administrative Law Judge had entirely ignored the statutory presumption, he would still have had to find that the weight of the medical evidence was in Hensley's favor, since the testimony of two treating physicians is normally entitled to greater weight than the testimony of one physician who examines the claimant only once, many months later, in connection with the claim. *See generally Combs v. Gardner*, 382 F.2d 949, 956–57 (6th Cir. 1967); *Shaw v.*

*Harris*, Civ. No. 79–869 (D.D.C., Nov. 6, 1979) at 5 ("as a matter of law the testimony in evidence of a doctor who treats a patient over a substantial period of time is entitled more consideration than the testimony of a doctor who examined a patient once."); *see also Robinson v. Richardson*, 360 F.Supp. 243, 250 (E.D.N.Y. 1973); *Claussell v. Secretary of HEW*, 337 F.Supp. 717, 722 (S.D.N.Y.1972); *Teague v. Gardner*, 281 F.Supp. 43, 48 (E.D.Tenn.1968).

14. The Board quoted Dr. Stolar's letter to WMATA which stated in part:

Psoriasis has so many spontaneous increases and decreases, and lesions, and extent [sic] that it is impossible to determine that any one pattern of injury may definitely be the responsible agent for its manifestations.

"disagreed with Dr. Nigra's opinion that trauma to an area of skin of a patient suffering from psoriasis will result in a flare of psoriasis in that area." App. at 8. If the WMATA doctor's testimony is so read by the Board, it is clear error. Medical texts on the disease recognize the fact that some kinds of trauma to the skin of a psoriatic patient may precipitate or aggravate the condition, see, e. g., 6 P. Cantor, *Traumatic Medicine and Surgery for the Attorney* 640–41 (1962) ("Chronic pressure caused by gripping tools may precipitate a psoriatic eruption of the palms.... The role of trauma in aggravating a pre-existing psoriasis has to be accepted."), and the WMATA physician acknowledged that fact as well. App. at 160.

Thus no testimony or evidence directly contradicted claimant's theory of work-relatedness, that under unusually physically demanding driving, his psoriatic hands broke out in pustular lesions and then cracked and bled from gripping the wheel. This constituted work-related aggravation, and since there was no substantial evidence to contradict this causal scenario, while ample evidence existed to support it, the Board's finding to the contrary is clearly erroneous.

## V. CONCLUSION

Our review of the record here convinces us that both the Administrative Law Judge and the Benefits Review Board failed properly to apply the statutory presumption concerning work-relatedness in this case. There was no "substantial evidence" contradicting either the presumption or the considerable independent testimony by Hensley and his two doctors supporting the claim that his psoriatic condition was aggravated by driving a bus. The only witness who held the contrary opinion, that the aggravation was not work-related, based his conclusion on a wholly unsupported assumption concerning the actual working conditions under which claimant was laboring. The

App. at 10. This concession by Dr. Stolar, the employer's only witness, would seem to rule out the notion that he could say work was not

decision and order of the Board is therefore reversed, and the case remanded for an appropriate award in accordance with this opinion. *Cf. Friend v. Britton, supra,* 220 F.2d at 824.

*So ordered.*

MacKINNON, Circuit Judge (dissenting).

The opinion of my colleagues, in this case under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.,* reverses the Administrative Law Judge and the Benefits Review Board by relying on the contention that the Board failed properly to apply the statutory presumption of coverage. They reach such result first by ruling there was no "substantial evidence" contradicting the presumption of coverage, and then by ruling that in any event there was no "substantial evidence in the record considered as a whole" to reject Hensley's claim that his psoriatic condition was *aggravated* by driving his bus over some bumpy pavement. In reaching these conclusions the majority, claiming reliance on "the humanitarian nature of the Act," but in reality relying on compassion, side-step longstanding principles of judicial review that are firmly established by decisions of the Supreme Court in Longshoremen's Act cases. Therefore, I must dissent.

### I.

Hensley had driven buses for the Washington Metropolitan Area Transportation Authority (WMATA) for 32 years. Since 1967 he has been plagued by general psoriasis, the cause of which he concedes is *not* work related. Hensley contends that in 1977 the new route he "picked" in the fall of 1976 (App. 17) became bumpy due to chuck holes and traffic of heavy vehicles, that this caused him to be bounced around in driving his bus, and, with supporting testimony from his treating doctors, that this caused a disabling aggravation of his longstanding psoriatic condition. As to the circumstances Hensley testified:

a responsible agent. If he could not, then the presumption of work-relatedness applies.

[D]uring the course of this time *my skin began to dry out and peel and crack*: and it was very hard for me—in other words, it would hurt to hold the steering wheel. And I was trying to drive with a thumb and finger proposition [sic]. But when I would grip the wheel and be out there on the job for a while, then it would crack open and bleed from the work, from doing the job, from holding the steering wheel; it would actually crack open and my hand would bleed.

App. 108 (Emphasis added). Hensley fixed August 15, 1977 as the date of his injury (aggravation).

The work related aggravation that is claimed here was capsulated in the following testimony by Hensley's regular treating doctor (Dr. Mitchell):

In August of 1977, Mr. Hensley came in with more extensive psoriasis. His psoriasis was what we call guttate type of psoriasis,[1] drop like, *all over the body*. And he had extensive pustular lesions on the palms and soles.

(App. 30) (Emphasis added). Note that Hensley's doctor claimed that in August 1977 his patient developed the psoriasis *"all over his body"* that also included the affliction on his palms and soles. The "severe pustular lesions of the palms *and soles*" were the reason his doctor considered "it was impossible [for Hensley] to continue" driving a bus, but these lesions were but one part of the guttate type psoriasis that manifested itself all at the same time. (App. 32) (Emphasis added).

In claiming that such aggravation was job related, Hensley's treating doctors opined that the aggravation resulted from the operation of a medical theory known as the Koebner phenomenon (App. 28, 31, 35, 40, 68, 73). This theory, according to Dr. Mitchell, with whom Hensley's other treating doctor (Dr. Nigra) agreed, holds that "if the dermis in a psoriatic patient is injured, [the patient] will get psoriatic lesions *in the area that was injured.*" (App. 28) (Empha-

sis added). The Koebner theory requires that there be some force that goes "entirely through [the] epidermis and injure[s] the dermis." (App. 40). There was testimony from Hensley's Dr. Mitchell indicating that blisters can cause Koebner phenomenon (App. 41), but no unequivocal testimony from anyone that Hensley had blisters. My colleagues, trying to explain Hensley's symptoms with a "blister theory," state there is no direct evidence to contradict claimant's theory that "his psoriatic hands first broke into pustular lesions and then cracked and bled from gripping the wheel." Maj. op. at 274; see also *id.* at 270 n.5. But evidence need not be "direct" to be substantial, and Hensley's testimony itself contradicts his blister theory. In relating the causal scenario that led to his disability he spoke of no blisters; rather, he said, "my skin began to dry out and peel and crack." (App. 108.) It is true that "pustular lesions" were later found on his hands and feet. But pus-filled lesions are not necessarily blisters. More likely than not they were the *result* of Hensley's aggravated psoriasis and not the cause. That at least is a reasonable inference, and it is for the Benefit Review Board and not this court to assess the relative weights of contrary inferences. Hensley's failure to testify as to blisters *preceding* the onset of what is claimed to be the operation of Koebner's phenomenon thus dooms his case at its most critical point—his hands. *The testimony of Hensley's Dr. Mitchell* also dooms his case at his feet. See *infra.* Dr. Mitchell also testified: "The friction or the abrasive pattern does not appear to exemplify [the "Koebner phenomenon, the trauma, the cutting of the skin"]" (App. 86). *Thus, even ignoring the substantial evidence introduced against Hensley, the evidence introduced in his behalf affords a reasonable inference that his aggravated psoriasis was not work-related.*

Dr. Stolar (the WMATA doctor) testified that Hensley's aggravation was not an ex-

---

1. Guttate lesions are lesions having a drop-like appearance. 6 P. Cantor, Traumatic Medicine and Surgery for the Attorney 643 (1962).

ample of the working of the Koebner phenomenon. The Administrative Law Judge and the Benefits Review Board agreed, finding that Hensley's condition was *not* work-aggravated. Such "findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3); *Banks v. Chicago Grain Trimmers Association, Inc.,* 390 U.S. 459, 467, 88 S.Ct. 1140, 1145, 20 L.Ed.2d 30 (1968); *Marcus v. Director,* 548 F.2d 1044, 1051 (D.C.Cir.1976). Therefore, this court must follow the decision of the Administrative Law Judge and the Board unless it is *not* supported by *substantial evidence.* There is a statutory presumption "[t]hat the claim comes within the provisions of the [Act]." 33 U.S.C. § 920(a). This presumption, however, is procedural and falls when the employer introduces substantial evidence to overcome it. *Del Vecchio v. Bowers,* 296 U.S. 280, 286, 56 S.Ct. 190, 193, 80 L.Ed. 229 (1935); *Travelers Ins. Co. v. Belair,* 412 F.2d 297, 301 n.6 (1st Cir. 1969). In an effort to keep this presumption alive, my colleagues poor mouth the testimony of Dr. Stolar, assert that he was "hired by WMATA" (who else would he be hired by?), claim that he was not qualified by "experience or knowledge" to give the expert testimony he did, and then, after reciting the presumption favoring a finding of causality, conclude: "We can find no *substantial* evidence to the contrary":

> [T]here is no evidence in the record that this third doctor [Dr. Stolar] had any particular experience or knowledge upon which to base his opinion regarding Hensley's "work pattern" as a bus driver, or his opinion regarding the "constant frictional pattern" to which Hensley was subjected on his particularly rough bus route during July and August of 1977.... [His] opinion on the issue of aggravation is [thus] not entitled to the "substantial" weight which it must have to overcome the Congressionally mandated presumption.

Maj. Op. at 270–271. This is a gross distortion of the factual testimony.

The record reflects that Dr. Stolar was qualified in the record as one of the nation's experts in dermatology. He had over 40 years experience in an extensive active practice and his qualifications were never challenged by Hensley. Let us look at "a little of [Dr. Stolar's] medical background", as reflected in the record, to determine if my colleagues are correct in their statement that Dr. Stolar did not have "any particular experience or knowledge" upon which to base his opinion.

> [He] graduated from Georgetown University [and its] Medical School ...:t, [interned] at Gallagher Municipal Hospital, a fellowship at Georgetown for two years; and then ... two years ... at New York University in Bellvue Hospital in New York. Then five years after that [he] was *Chief* of Dermatology Section for the United States Army, establishing a pilot program [turning out "specialists"] for them, and providing training for a small number of the 60,000 physicians who came on active duty.... [He then was] consultant to the V.A. Hospital, consultant to Walter Reed, the Army; and subsequently the Navy, and subsequently became the *national* consultant for the Air Force. [He now is] clinical professor of medicine at Georgetown, and professor of dermatology at Howard; [he] maintain[s] a rotation service in the office for residents and students who come in for observation and training; and [has] a routine of going to the several hospitals ... Navy, Walter Reed—as part of a teaching program that they have established in those institutions.

> [He] carried on a similar program at Georgetown and at Howard [and is] interested in a number of dermatological problems, some of which are esoteric, and [has] published material on them.

\* \* \* \* \* \*

MRS. ENDRESS [Hensley's lawyer]: *No questions.*

(App. 64–65) (Emphasis added).

## II.

This case, which involves a question of medical fact, turns on whether the testimo-

ny of this national expert in dermatology (Dr. Stolar), who is "Board-certified in that specialty" (App. 64), *and other testimony of record,* constitutes "substantial evidence." The ALJ observed "Dr. Stolar is an impressively credentialled member of a learned profession." (App. 84). Dr. Stolar gave his opinion after reading Dr. Nigra's medical reports (App. 79), letters from Drs. Mitchell and Nigra (App. 65), and after personally interviewing Hensley as to his medical history and then subjecting him to a physical examination. (App. 65, 157–160). The colored pictures of Hensley's affliction that Dr. Stolar had taken are an appendix to the WMATA brief.

It is the testimony (opinion, and uncontroverted and admitted factual statements) of this accredited national medical expert in dermatology, and substantial additional circumstantial evidence, that my colleagues recklessly condemn as not "substantial" and consign to oblivion. In lieu of Dr. Stolar's testimony, and the additional circumstantial evidence, they rely completely on the opinion of the very dermatologist who had been treating Hensley for many years when his psoriasis flared up and choose to ignore that portion of the dermatologist's testimony that is fatal to his patient's claim. If any doctor's testimony should be questioned it should be that of Hensley's regular dermatologist, who had substantially less experience than had Dr. Stolar and who, because he had been treating Hensley for psoriasis for years, had a definite self-interest in attributing Hensley's psoriatic flare-up to some cause other than his own treatment. Dr. Stolar testified that he probably would have stopped Hensley from working long before and tried to clear up his skin. (App. 83, 89).

Hensley's doctor (Mitchell) was not a novice in dermatology but his medical credentials were definitely inferior to those of Dr. Stolar. He was Board certified in 1963, had been licensed to practice for about 14 years. Recently he had been "employed by Group Health" as a dermatologist. (App. 23). He

was in private practice only from 1964 to 1967 and for a "short time after he came to Washington." He was on the staff at Doctor's Hospital and Georgetown University. As to publications, "only one."

Relying on his own analysis, Dr. Mitchell claimed the Koebner phenomenon supported his contention that Hensley's psoriatic condition was *aggravated* by his occupation as a bus driver.[2] The aggravation claimed was the development of *psoriatic lesions* during the time he was driving his bus over some bumpy pavement (App. 28, 30, 32, 48). However, Dr. Stolar's testimony and reports indicate that in his expert opinion the Koebner phenomenon did *not* support the contention that the psoriatic lesions constituting the alleged aggravation were caused by Hensley's driving his bus over the bumpy pavement (App. 73, 157–158, 159–160). In determining work relatedness all doctors, of necessity, relied upon their interviews with Hensley, but my colleagues determine that the testimony of the WMATA doctor because of such reliance is not substantial. Maj. op. at 271. There is no justification for refusing to accept Hensley's factual statements as reported to Dr. Stolar and accepting them when given to his own doctor. There is no testimony that either doctor was with him when he was driving the bus. If Dr. Stolar could not give an opinion on the basis of the patient's statements, neither could Hensley's doctors.

On the controlling issue the Administrative Law Judge in his Findings of Fact and Conclusions of Law stated:

The sole issue is one of medical fact, specifically, whether Mr. Hensley's holding the steering wheel of a bus, being bounced in the seat and using his feet in driving has aggravated his underlying non-job related condition. I believe that the weight of substantial evidence preponderates on the side of non-exacerbation. Thus, the treating physician testified that Koebner's phenomenon is produced only by injuries that penetrate the

---

**2.** Another doctor (Nigra) who treated Hensley subsequently opined that his occupation "could

result in trauma and therefore flaring of his basic [psoriatic] condition." (App. 154).

epidermis and injure the dermis but that "it's well established that the mild, repeated trauma to the knees and elbows of patients accounts for the characteristic distribution of psoriasis, and this is a form of Koebner's phenomenon." Aside from the internal inconsistency of this testimony, photographs submitted in evidence with his report show that, while Hensley's elbows have extensive psoriatic lesions, his knees are clear and uninvolved despite the fact that his work is largely performed in a seated position and at least one leg, according to Hensley, "does all the work." Ironically, this physician's patient's condition is significantly inconsistent with the premise upon which the entire theory of causation is based.

While I am mindful of the presumptions of section 20 of the Act, the provisions of that section mandate that these presumptions cannot supply causation where other substantial evidence indicates that it is non-existent. *Cf. Calbeck v. Strachan Shipping Company*, 306 F.2d 693, 694, 696 (5th Cir. 1962). Accordingly, the claim will be denied.

(App. 19).

The Administrative Appeals Judges, one judge dissenting,[3] after reviewing the record and the ALJ decision, reached the same conclusion:

The record as summarized above contains substantial evidence to support the administrative law judge's conclusion. Dr. Stolar stated clearly on several occasions that he was of the opinion that claimant's condition was not work-aggravated. Although the other physicians expressed opinions to the contrary, the administrative law judge is entitled to weigh the medical evidence and draw his own inferences from it and is not bound to accept the opinion or theory of any particular medical examiner. *Todd Shipyards Corp. v. Donovan*, 300 F.2d 741 (5th Cir. 1962). Dr. Stolar's opinion that claimant's psoriasis was not work-aggravated together with the record evidence that *areas not subject to trauma were*

*also involved and that the problem has continued despite the fact that claimant has been removed from the continual pounding constitutes substantial evidence to support the administrative law judge's ultimate conclusion.*[8] [Emphasis added].

[8] We acknowledge that the administrative law judge's analysis is not a model of clarity. Also, his stressing of the fact that claimant's knees were not affected by psoriasis is puzzling in light of the fact that claimant's knees did not appear to be subject to repeated trauma. However, we do not believe these factors so undermine the administrative law judge's ultimate finding so as to require reversal.

Accordingly, the Decision and Order of the administrative law judge is affirmed.

(App. 11–12) (Emphasis added).

These decisions by agency officials specially trained in these workmen's compensation matters under the Longshoremen's Act clearly refute my colleagues' claim that Dr. Stolar's testimony and the other supporting evidentiary facts do not constitute "substantial evidence."

### III.

The evidentiary record contains several basic facts that the Board and the ALJ relied upon in their opinions which in my view support their conclusion that the aggravation in Hensley's psoriatic condition was *not* work related, i. e.,

(1) Hensley began as a bus driver in 1946 and he had been driving continuously for 32 years.

(2) He contracted psoriasis in 1967 and it is admitted that this was *not* the result of any work related cause. (App. 2).

(3) "[Hensley] had dental surgery in the summer of 1977, *and following that* his psoriasis flared badly." (App. 154, Letter of Hensley's Dr. Nigra) (Emphasis added). This is the approximate time when he claimed his work caused the aggravating flare-up.

(4) Other pre-existing causes that are recognized to cause such aggravation as Hensley suffered were present and were *not* work related. They include: (a) obesi-

---

**3.** The dissent was sketchy, generalized and largely conclusory.

ty, (b) severe emotional distress, and (c) burns of the skin (Cf., App. 156). Hensley had all of these causes. He was "constantly told that his obesity is an aggravating factor in his psoriasis." (App. 52). He had suffered extreme emotional distress in 1975 when his son attempted suicide and wound up being "mentally incapacitated and back at home." (App. 45–46).[4] He had also suffered some skin burns from the ultraviolet treatment he was receiving from the doctor for his psoriasis. (App. 41, 68, 159).

(5) Hensley's Group Health medical records show that he had "Lesions of psoriasis in scalp, both elbows and groin area" as far back as *July 15, 1970.* (App. 162). This same *1970 entry* stated: "Non-psoriatic macular papular lesions—*Koebner's phenomena and in groin area.*" (App. 162). Thus, his lesions were of longstanding duration and the Koebner phenomenon was claimed to be causing aggravation for reasons that were not claimed to be work related as far back as 1970. His situation was much the same in 1978. He had lesions on his hands and the soles of his feet, which he attributed to work-related physical trauma. *The claim with respect to his feet, however, was subsequently attributed to another cause by his doctor.* But he also had lesions in other areas of his body *where no trauma was claimed to exist.* His scalp was "heavily crusted all over," and he had lesions on the groins, perineum, upper inner thighs, knees,

elbows, center of the back, and buttocks. Dr. Stolar stated that he "looked for evidence of Koebner phenomenon, but did not find any. The varying lesions appear to be spontaneous and well established." (App. 158).

(6) On August 15, 1977, after years of medical treatment which controlled his psoriatic condition reasonably well, it again became aggravated over his whole body. Ignoring the other aggravating lesions Hensley contended that the contemporaneous aggravation of his palms and soles was caused by the recent "pounding" which resulted from driving his bus over the new (bumpy) route. He had selected this new bus route in the fall of 1976 (App. 3).

(7) Hensley's doctors in 1977 contended that the Koebner phenomenon supported their claim that his aggravated condition was work related. The doctors had also attributed his 1970 flare-up to the Koebner phenomenon but had never contended that the aggravation at that time was work related. As to the 1977 claim (the present claim) the Board ruled against Hensley and pointed out that his *aggravation (lesions) was present in areas not subject to the alleged physical work-related trauma that he contended were the cause of the aggravation.* His right ankle[5] and stomach and other areas that were not involved in any of the alleged trauma also had the same lesions[6] (App. 6) and his condition remained

4. Claimant did not contend his emotional distress was work related (App. 6). *Hensley's treating doctor* testified:

> Mr. Hensley has had a lot of emotional upsets. I believe he had a son who tried to kill himself, and did an inadequate job and wound up being "mentally incapacitated" and back at home. This was extremely upsetting to Mr. Hensley.
> And I can tell you, Mr. Hensley does flare with emotional stress. I couldn't say that his condition in 1977 was related to anything other than maybe this is an on-going stress in his life, because this, as I recall, happened in 1975, I believe.
> [Hensley's medical record in Dr. Turner's handwriting for January 10, 1975 states:] "Series of catastrophes hit his family." I have trouble reading Dr. Turner's handwriting, too. Looks like: "... initiating last spring and he's starting to flare up again. He

has a few small marks on the elbows, his scalp is totally involved, as is his buttocks and intergluteal and inguinal areas are most severely involved."
(App. 46) (Emphasis added).

5. Hensley's doctor testified he could not "relate" the psoriatic eruption on his right ankle to his use of his "right foot to brake and to use the gas pedal." (App. 57).

6. There was no work related scratching, cutting or bumping of his belly, chest, elbows or backside, but all these areas had psoriatic lesions (App. 42–43). My colleagues refer to pustular lesions on his hands and feet but it was the lesions, not their pustular nature, that caused the bleeding. Hensley never disputes the argument that the lesions elsewhere on his body belie his claim that his work caused the lesions on his hands and feet. (Cf. App. 6).

severe three months after he quit driving a bus (App. 6). The existence of such lesions in areas that could *not* be considered to have been affected by the alleged work related cause (trauma) is extremely significant because Hensley's own doctor testified that "trauma to an area of skin in a patient who has psoriasis will result in a flare of psoriasis *in the traumatic area.*" (App. 4, 14) (Emphasis added). *Thus, the existence of the numerous psoriatic lesions in areas admittedly not affected by the alleged trauma was fatal to the probative effect of the testimonial claims and theory of Hensley's doctors.* And see (8) *infra.*

(8) Hensley's doctor (Mitchell) admitted that the psoriatic lesions on the soles of the feet of his bus driving patient were caused by "his walking":

> I think *his* [Hensley's] *walking was aggravating his feet.* I think Mr. Hensley was a psoriatic who we describe as very brittle. And a lot of things would set him off. And I think this was one of the contributing factors to his getting worse.

(App. 53) (Emphasis added). There is no testimony in the record that such "walking" was related to his occupation as a bus driver. Thus, here again the testimony of Hensley's own doctor is fatal to his claim, i. e., the pustular lesions on his feet were caused by a non-work related reason. And see (9) *infra.*

(9) This leaves only the issue of the application of the Koebner phenomenon to Hensley's *hands.* It has already been noted, with respect to his hands, that the *sine qua non* for work-related causation—some work related force that causes a penetration of the outer skin and injures the *inner skin*—is absent here. Part II *supra.* Also, since his hands were affected in *exactly* the same manner as his feet, and the aggravation of his feet was not work related, the Board's decision that the entire aggravation was not work related is amply supported by substantial evidence and logic. This conclusion is even stronger when it is recognized that lesions also occurred over the rest of his body and *none* of the other areas was affected by a work related cause.

**7.** The dissent to the decision by the Benefits Review Board makes the same error (App. 14).

## IV.

From all the medical history and facts Dr. Stolar concluded that Hensley's condition "was [not] work related or work aggravated." (App. 160). The ALJ and the Board credited his testimony and opinion. My colleagues say such record testimony does *not* constitute substantial evidence and they reverse the judgment based thereon because, allegedly absent substantial evidence, the "Board failed properly to apply the statutory presumption [of coverage] concerning work-relatedness in this case." Maj. op. at 274. In reality this is a blatant attempt to reweigh the evidence in violation of the Supreme Court's ruling in *Del Vecchio v. Bowers, supra.* If Dr. Stolar's testimony does not constitute "substantial evidence" then substantial evidence does not exist. To characterize his testimony, and the very strong circumstantial evidence, as "insubstantial" is to transmogrify the record.

All this leads to my colleagues misapplying the statutory procedural presumption of coverage in § 920(a). They give lip service to the proper rule but end up treating the presumption as substantive rather than procedural by applying it to resolve disputed factual issues.[7] *Del Vecchio v. Bowers,* 296 U.S. 280, 56 S.Ct. 190, 80 L.Ed. 229 (1936) is the definitive case on this point. It dealt with the § 920(d) presumption against suicide which has the same status as the presumption of coverage that is involved here:

> The statement in the act that the evidence to overcome the effect of the presumption must be substantial adds nothing to the well understood principle that a finding must be supported by evidence.[ ] *Once the employer has carried his burden by offering testimony sufficient to justify a finding of suicide, the presumption falls out of the case. It never had and cannot acquire the attribute of evidence in the claimant's favor.[ ] Its only office is to control the result where there is an entire lack of*

*competent evidence.* If the employer alone adduces evidence which tends to support the theory of suicide, the case must be decided upon that evidence. Where the claimant offers substantial evidence in opposition, as was the case here, the issue must be resolved upon the whole body of proof pro and con; [ ] and *if it permits an inference either way upon the question of suicide, the Deputy Commissioner and he alone is empowered to draw the inference; his decision as to the weight of the evidence may not be disturbed by the court.*

296 U.S. at 286–87, 56 S.Ct. at 193. (Footnotes omitted).

*Del Vecchio* thus limits presumptions under § 920 to their procedural effect and prohibits such presumption from having any substantive or evidentiary effect. The Board properly found that the presumption of § 920(a) had been rebutted and that there was substantial evidence on the record considered as a whole to support its finding that the cause of Hensley's aggravation was *not* work related.

When my colleagues treat the presumption as substantive rather than as procedural they commit error in so doing. The ALJ and the Board had extensive circumstantial evidence from all the doctors that completely belies Hensley's work-related theory. See n.4, *supra*, for testimony of Hensley's doctor. In addition, they had a choice between the expert testimony of a national medical expert and the opinion of a doctor of lesser stature and experience whose personal treatment of the patient as a potential cause of his aggravation was directly involved. They elected to credit Dr. Stolar's opinion, and the surrounding factual circumstances, amply established in the record, also supported their decision. The claim that the psoriatic lesions on Hensley's hands and feet were *caused* by the bouncing of his bus on the road, and that these lesions were examples of Koebner's phenome-

non, was refuted by the fact that he had similar lesions on other areas of his body which were not subject to the work related cause he contended brought about the aggravated condition of his feet and hands. My colleagues wholly ignore the circumstantial evidence, including the fatally adverse testimony of Hensley's doctor (n.4 *supra*) and apply the discredited claim that "normally . . . greater weight" goes to two physicians rather than one. Maj. op. at 273 n.13.[8] There is no such rule. The greater weight should be given to the more creditable testimony, all factors considered. And the *weight* of the evidence is primarily to be determined by the ALJ and the Board.

The decisions of the Supreme Court require that the Administrative Law Judge and the Benefits Review Board be affirmed.

"It matters not that the basic facts from which . the Deputy Commissioner draws this inference are undisputed rather than controverted. . . . It is likewise immaterial that the facts permit the drawing of diverse inferences. *The Deputy Commissioner alone is charged with the duty of initially selecting the inference which seems most reasonable and his choice, if otherwise sustainable, may not be disturbed by a reviewing court. . . .* Moreover, the fact that the inference of the type here made by the Deputy Commissioner involves an application of a broad statutory term or phrase to a specific set of facts gives rise to no greater scope of judicial review. . . ." *Cardillo v. Liberty Mutual Ins. Co.,* [330 U.S. 469, 478, 67 S.Ct. 801, 807, 91 L.Ed. 1028.]

The rule of judicial review has therefore emerged that the inferences drawn by the Deputy Commissioner are to be accepted unless they are irrational or "unsupported by substantial evidence on the record . . . as a whole." *O'Leary v. Brown-Pacific-Maxon, Inc.,* [340 U.S.

---

**8.** My colleagues completely dismiss Dr. Stolar's opinion because he had no "particular experience or knowledge" of Hensley's driving conditions. Maj. op. at 271. Yet the majority is prepared to give "greater weight" to the testimony of Hensley's two treating physicians, whose experience and knowledge in this respect were no greater. In fact all doctors obtained their knowledge of Hensley's driving conditions from their interviews with Hensley.

504] 508 [71 S.Ct. 470, 472, 95 L.Ed. 483] (1951).

*O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc.,* 380 U.S. 359, 361–62, 85 S.Ct. 1012, 1014, 13 L.Ed.2d 895 (1965). *Banks v. Chicago Grain Trimmers, supra,* 390 U.S. at 467, 88 S.Ct. at 1146, also held that where

> some of the testimony of the petitioner's medical expert was arguably inconsistent with other parts of his testimony, it was within the province of the Deputy Commissioner to credit part of the witness' testimony without accepting it all.

390 U.S. at 467, 88 S.Ct. at 1146.

### V.

The heavy reliance that my colleagues place on our decision in *Wheatley v. Adler,* 407 F.2d 307, 313–14 (D.C.Cir.1968), (Maj. op. at 267, 267–268, 268) is misplaced so far as this case is concerned or as to any case where there was medical testimony that the injury was *not* work related. In *Wheatley* the doctor for the defendant "was *unable* to state an opinion on the key question, whether there was a work related factor that aggravated the employee's condition." 407 F.2d at 313 (Emphasis added). Thus, the decision in *Wheatley* is not relevant here where the doctor did testify as to his opinion. This likewise is not a case like *Ryan-Walsh Stevedoring Co. v. Trainer,* 601 F.2d 1306 (D.C.Cir.1979) where the case was remanded to determine if claimant was married to the deceased because the contrary determination was not based upon the "applicable state law of domestic relations as required by [the applicable Supreme Court opinion]." 601 F.2d at 1315. Nor can WMATA's case against Hensley's claim by any stretch of the imagination be construed to involve "isolated evidence." *Friend v. Britton,* 220 F.2d 820 (D.C.Cir.), *cert. denied,* 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. 745 (1955), *cited in* Maj. op. at 267, 268.

Another substantial error lies in the persistence with which my colleagues ignore both circumstantial evidence and adverse medical testimony in stating that Dr. Stolar's testimony is the only contrary evidence. See *supra* at p. 275; n.4; p. 280, paragraph (8); and Part III, *passim.*

My colleagues have clearly exceeded their judicial authority. If the pattern they follow here were proper, all testimony of employer physicians who examined the worker *after* he made his claim could be arbitrarily ignored as "not entitled to 'substantial' weight" (Maj. op. at 271), and *every* contested claim could be determined by the presumption of coverage and a sympathetic desire to bring about "beneficent purposes and humanitarian" objectives. (Maj. op. at 267).

### *Conclusion*

In sum the majority opinion is unreliable because—

(1) it exceeds its authority under the Longshoreman's and Harbor Workers' Compensation Act by refusing to give proper recognition and weight to the findings, conclusions and decisions of the Administrative Law Judge and the Benefits Review Board;

(2) it fails, for improper reasons, to give *any* consideration to the highly relevant expert testimony of Dr. Stolar;

(3) it relies upon non-existent testimony to support its "blister theory";

(4) it ignores the adverse testimony of Hensley and his own doctors that aggravation was caused by non-work related causes;

(5) it ignores the likelihood that Hensley's non-work related psoriasis was aggravated by other active and recognized non-work related causes such as obesity, severe emotional distress, and an earlier instance of aggravation of his psoriasis by operation of the Koebner phenomenon from non-work related causes.