**BLUDWORTH SHIPYARD, INC. and Travelers Insurance Co., Petitioners,**

v.

**Alphonso LIRA and Director, Office of Workers' Compensation Programs, Respondents.**

**No. 82–4102.**

United States Court of Appeals, Fifth Circuit.

March 21, 1983.

G. Wesley Urquhart, and Robert J. Cunningham, Houston, Tex., for petitioners.

Stephen M. Vaughan, Houston, Tex., Joshua T. Gillelan, Washington, D.C., for respondents.

Before CLARK, Chief Judge, THORN-BERRY and REAVLEY, Circuit Judges.

CLARK, Chief Judge:

Alphonso Lira brought this Longshoremen's and Harbor Workers' Compensation Act claim seeking reimbursement for medical expenses allegedly precipitated by a work injury. An Administrative Law Judge denied his claim, but the Benefits Review Board reversed. Bludworth Shipyard, Inc., Lira's employer, appeals from that order. Because Lira's intentional concealment of vital information, and not an employment-related injury, was the direct cause of the injury for which compensation is sought, we reverse.

I

Lira became a heroin addict in the late 1960's. He eventually went through a methadone maintenance program that lasted more than three years. He emerged from the program physiologically independent of heroin, but he remained, to some degree, psychologically dependent on the drug. For several years he engaged in "chipping," the intermittent use of heroin.

Lira applied for a job at Bludworth Shipyard in 1976. During the application process, Lira was required to complete a medical questionnaire. Lira wrote on the questionnaire that he had never used narcotic drugs. When asked at the hearing why he lied, Lira testified that he did not think he would get the job if he told the truth.

Bludworth employed Lira as a welder. He was never reprimanded for drug use by Bludworth. He repeatedly testified that he was too occupied in his new job to use any heroin after he started working:

> When I started working for Bludworth it was hard work, and I got so occupied in it I don't think I used any if I am not mistaken while I was there. Before that, I did. But during that time at Bludworth, it was a good job and it kept me busy and kept my mind occupied. I had no desire then.

During cross-examination the following exchange took place:

Q: I think you testified you did not use heroin after going to work for Bludworth.

A: Right.

Q: Not even once?

A: Not even once that I remember.

Q: Okay. Let me stop you right there. You are saying sometimes you may have used heroin and you don't remember about it?

A: I don't remember the days, but I know that when I was at Bludworth I did not use any.

Lira injured his back in the course of his employment. He went to Dr. Frank Parrish for treatment. Although he was suffering from considerable pain, Lira did not engage in any chipping between the time he was injured and the time he met with Dr. Parrish.

Dr. Parrish prescribed a conservative treatment program. He instructed Lira to do special exercises and refrain from heavy exertion. He prescribed codeine and other drugs to combat the pain. Codeine is a narcotic. Lira did not tell Dr. Parrish that he was a former addict.

In due course, it became apparent that a conservative treatment program would not solve Lira's problems. A myelogram revealed a large intervertebral disc herniation which would require surgery. Lira was admitted to the hospital. He did not tell anyone connected with his treatment at the hospital that he had been a heroin addict.

The operation appeared to be relatively successful. Lira remained in the hospital for thirteen days. During his stay he was given repeated doses of narcotic drugs, including morphine and codeine. He received more medication than is normally required for post-operative back surgery.

Lira continued to rely on pain-killing narcotics after he was released from the hospital. Dr. Parrish would regularly prescribe additional narcotics. Nevertheless, the pain persisted. Lira was not satisfied with his legal supply of drugs. He took to the streets and began chipping again. He

started by using heroin weekly, then daily. Within months, he was completely readdicted to the ruinous soporific.

His life in shambles, Lira made his way to Dr. Victor J. Cardenas, a neuropsychiatrist specializing in the treatment of problems related to drug and alcohol abuse. Dr. Cardenas freed Lira of his drug addiction by means of a thorough counselling and drug rehabilitation program.

Bludworth, through its insurance carrier, the Travelers Insurance Company, compensated Lira for temporary total disability and paid all medical expenses directly associated with his back injury. Lira does not suggest that he was undercompensated for these aspects of his claim. Rather, his disputed claim only involves the cost of the drug detoxification program administered by Dr. Cardenas. Bludworth has refused to reimburse him for these expenses. Thus, this suit.

The matter was initially heard by an Administrative Law Judge. The ALJ was unsympathetic to Lira's novel claim. Despite Lira's repeated testimony to the contrary, the ALJ found that Lira used heroin until almost immediately prior to his industrial accident. He was impressed by Lira's statement that "[a]nybody who started using drugs would [use more and more drugs] even if he wasn't addicted. If he started chipping a little, eventually he would get to using every day—anybody." He concluded that Lira's readdiction "was neither the result of the injury nor the result of the injury combined with his prior addiction, but was the result of his prior addiction alone." On this basis, he denied Lira's claim for medical expenses incurred as a result of his readdiction.

The Benefits Review Board reversed. A majority of the panel found that there was no evidence that Lira was addicted to drugs at the time of his work injury. It pointed to testimony "indicating that the continu-

ous administration of drugs to a prior addict over a period of several days would result in a psychological dependence and then a physical dependence." It pointed out that Bludworth had not offered any evidence "that the administration of narcotic medication to claimant, a prior addict, did *not* lead to his readdiction." The majority concluded that Bludworth failed to rebut the presumption[1] that Lira's readdiction was causally related to his work injury. It is from that ruling that Bludworth appeals.

## II

Section 3 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 903, provides that compensation shall be payable "in respect of disability or death of an employee ...." Section 902(10) defines disability as "incapacity because of injury ...." Section 902(2) defines injury as an "accidental injury or death *arising out of* and in the course of employment ...." (emphasis added) The words "arising out of" instruct that the employment must have caused the injury. *U.S. Industries/Federal Sheet Metal, Inc. v. Director, Office of Workers' Compensation Programs, United States Department of Labor,* 455 U.S. 608, 102 S.Ct. 1312, 1318, 71 L.Ed.2d 495 (1982).

Bludworth argues at great length that Lira's claimed injury is not compensable because it resulted from his prior condition. This argument is without merit. We have repeatedly held that an employer takes an employee as he finds him. Aggravation of a preexisting condition can be an "injury" under the Act. *Fulks v. Avondale Shipyards, Inc.,* 637 F.2d 1008, 1012 (5th Cir.1981), *cert. denied,* 454 U.S. 1080, 102 S.Ct. 633, 70 L.Ed.2d 613 (1982); *Equitable Equipment Company v. Hardy,* 558 F.2d 1192, 1195 (5th Cir.1977); *Cooper Stevedor-*

---

1. 33 U.S.C. § 920(a) provides:

    In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary—

    (a) That the claim comes within the provisions of this chapter.

*ing of Louisiana, Inc. v. Washington,* 556 F.2d 268, 271 (5th Cir.1977).[2]

The more difficult question in this case involves events that occurred after Lira was injured. Bludworth argues that Lira's deliberate failure to inform his doctors that he was a prior addict was the true cause of his readdiction. It argues that Lira's omission was an intervening cause that relieved it of all responsibility.

While the law in this area does not form a simple fit, it is logically consistent. It begins with the rule that the concept of proximate cause, as it is applied in the law of torts, is not applicable in the LHWCA setting. *Voris v. Texas Employers Ins. Ass'n,* 190 F.2d 929, 934 (5th Cir.1951), *cert. denied,* 342 U.S. 932, 72 S.Ct. 376, 96 L.Ed. 694 (1951); *Southern Stevedoring Co. v. Henderson,* 175 F.2d 863, 865 (5th Cir.1949). This is because proximate cause analysis in a typical tort case focuses on the question whether a party, in the conduct of his everyday affairs, should be held legally responsible for remote consequences of his acts. The inquiry under the LHWCA is much narrower. The court's sole function is to determine whether the injury complained of was one "arising out of" the employment. Once causation in fact is established, with only a few exceptions, the court's function is at an end.

One such exception is made when there is a supervening, independent cause of the injury in question. In *Mississippi Coast Marine v. Bosarge,* 637 F.2d 994 (5th Cir. 1981), we held that "[a] subsequent injury is compensable if it is the direct and natural result of a compensable primary injury, as long as the subsequent progression of the condition is not shown to have been worsened by an independent cause." *Id.* at 1000. In *Atlantic Marine, Inc. v. Bruce,* 661

F.2d 898, 901 (5th Cir.1981), we cited *Bosarge* in support of our holding that the claimant's arteriosclerosis was not a supervening cause that would prevent an award of compensation.

Some of the language in *Voris v. Texas Employers Ins. Ass'n,* 190 F.2d 929 (5th Cir.1951), *cert. denied,* 342 U.S. 932, 72 S.Ct. 376, 96 L.Ed. 694 (1951) seems to suggest that an intervening cause analysis can never have a place in an LHWCA case. In *Voris,* this court stated: "Compensation, as we have held, is payable under the Act irrespective of fault as a cause of the injury and the concept of independent, intervening cause as that concept is applied in the law of torts." *Id.* at 934 (citing *Southern Stevedoring Co. v. Henderson,* 175 F.2d 863, 865 (5th Cir.1949)) (emphasis omitted). However, when this statement is read in context, it can be readily seen that it merely acknowledges that policy considerations developed in general tort law are inapplicable under the LHWCA scheme. The *Voris* court went on to state: "There must, however, under the Act, be some connection between the death and the employment, and the causal effect attributable to the employment must not have been overpowered and nullified by influences originating entirely outside the employment." *Id.* at 865. Thus, a careful evaluation of *Voris* reveals that the language contained therein is not wholly inconsistent with this court's later opinions.

We noted in *Bruce, supra* at 901 n. 5, that there is some tension between the standard enunciated in *Bosarge* and that set out in *Voris.* "Whereas *Bosarge* appears to require only a simple "worsening" to give rise to a supervening cause, in *Voris v. Texas Employers Inc. Assoc.,* 190 F.2d 929, 934 (5th Cir.1951), we looked for overpowering and nullifying effects." *Id.* Both cases,

**2.** *Accord: Volpe v. Northeast Marine Terminals,* 671 F.2d 697, 701 (2d Cir.1982); *Hensley v. Washington Metro. Area Transit Authority,* 655 F.2d 264, 268 (D.C.Cir.1981), *cert. denied,* 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed.2d 160 (1982) ("[T]he fact that the injury would not have resulted but for the pre-existing disease, or might just have well been caused by a similar strain at home or at recreation, are both

immaterial."); *Gardner v. Director, Office of Workers' Compensation Programs,* 640 F.2d 1385, 1389 (1st Cir.1981); *Cordero v. Triple A Machine Shop,* 580 F.2d 1331, 1335 (9th Cir.), *cert. denied,* 440 U.S. 911, 99 S.Ct. 1223, 59 L.Ed.2d 459 (1978); *J.V. Vozzolo, Inc. v. Britton,* 377 F.2d 144, 148 (D.C.Cir.1967) (employers accept with their employees the frailties that predispose them to bodily hurt).

however, recognize that subsequent events may interrupt the causal chain between an original work-related injury and its remote consequences. In this case, Lira's misconduct satisfies either test.

■ In sum, the case law of this circuit demonstrates that, in an LHWCA case, an intervening cause may sever the causal connection between an original work-related injury and subsequent consequences a worker may suffer. The employee's own deliberate conduct may constitute such an intervening cause. If the remote consequences are the direct result of the employee's unexcused, intentional misconduct, and are only the indirect, unforeseeable result of the work-related injury, the employee may not recover under the LHWCA. *See* 1 A. Larson, The Law of Workmen's Compensation § 1300 (1980) ("When the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct.").

■ The dominant intent of Congress in enacting the LHWCA was to help longshoremen. The Act is intended to not only provide injured employees with more immediate and less expensive relief than that available in a common law tort action, but to rehabilitate injured workers so that they might become productive members of society. *Reed v. Steamship Yaka,* 373 U.S. 410, 415, 83 S.Ct. 1349, 1353, 10 L.Ed.2d 448 (1963); *New Orleans (Gulfwide) Stevedores v. Turner,* 661 F.2d 1031, 1042 (5th Cir. 1981); *Avasthi v. United States,* 608 F.2d 1059, 1060 (5th Cir.1979). It would not further these humanitarian purposes to hold that an employee may burden the cost of the compensation program by collecting compensation or expenses for consequences

that are the direct result of his own, post-injury misconduct.

### III

■ We assume without deciding that Lira's readdiction would normally constitute an "injury" as that term is defined in the Act.[3] The Act's liberal concept of causation applies to subsequent injuries as well as to initial ones. *Bruce, supra* at 901; *Bosarge, supra* at 1000. For example, in *Bruce,* the employee fell from a scaffold in 1973 and injured his back. He underwent a myelogram and then disc surgery. Because of persisting pain, he suffered a "severe post-traumatic, anxiety-depressive reaction." In 1977, he was readmitted to the hospital. His doctors concluded that a second myelogram would be necessary. On the day he was scheduled for the treatment, he left the hospital temporarily for a haircut, and while gone, suffered a heart attack. The ALJ and Benefits Review Board found that the heart attack was caused by the employee's "continuing emotional distress coupled with his apprehension over having to undergo another myelogram and that, therefore, petitioner should pay the medical expenses associated with the heart attack." In affirming, this court rejected the employer's argument that the connection between the 1973 back injury and the 1977 heart attack was too tenuous. *Id.* at 901.

Lira's heroin claim is altogether different. His intentional failure to inform his treating physicians that he was a prior addict constituted a supervening independent cause that worsened his condition. His omission overpowered and nullified the causal connection between his prior back injury and his subsequent readdiction to heroin.

Lira never told Dr. Parrish that he had once been addicted to heroin. Lira admitted that his omission was not an oversight:

**3.** *Larson, supra* § 13.21 cites numerous state court decisions holding that, where drugs used in the treatment of a compensable injury lead to narcotic addiction or alcoholism, the ensuing consequences are compensable, including *Ballard v. Workmen's Compensation App. Bd.,* 3

Cal.3d 832, 92 Cal.Rptr. 1, 478 P.2d 937 (1971) (prescriptions not great enough to cause addiction, but due in part to claimant's personality problems, she took additional drugs and became addicted).

Q: Now, did you tell Dr. Parrish that you had been an addict?

A: No.

Q: Why not?

A: Well, there's a lot of pain involved in this. I was afraid if he knew that I had used heroin before, he might have cut me off that medication, you know. And I—you know, all that medication was relieving the pain and I didn't want to cut it off. Maybe I shouldn't have lied, but I did.

The record also indicates that Lira never told anybody at the hospital about his prior drug addiction.

Because Dr. Parrish died prior to the hearing, his partner testified both from personal knowledge and as an expert. When he was asked: "If you knew the man to be an ex-addict, would you prescribe a narcotic medication, he answered: "No." He testified that special precautions must be taken in post-operative cases involving former addicts. Dr. Cardenas, Lira's own expert witness, admitted that at the very least, a treating physician who knows that he is dealing with a former addict will seek expert advice. He will do everything possible to minimize the risk of a recurrence.

The BRB noted that no special care had been taken to avoid possible readdiction when Lira was administered medication for his pain. Lira was administered large quantities of narcotic drugs between the time he initially consulted Dr. Parrish and the time he became readdicted. Although

this was appropriate pain treatment for a normal patient, it was an incredibly parlous course for a former addict.[4] Had Lira not intentionally concealed his prior addiction, precautions could have been taken. In that event, all the medical evidence suggests that his readdiction could have been prevented.[5]

▮ Lira's omission in this case was deliberate. There was an intentional misrepresentation, and that misrepresentation directly caused the complications in his condition. We do not decide whether the same result would obtain if Lira unintentionally failed to inform the hospital of his prior condition. Obviously, if Lira did not know of a particular weakness or susceptibility, and therefore did not know he should advise those treating him, there would be no intervening cause. Our holding stands for the limited proposition that an employee's unjustified, intentional misconduct may constitute an intervening cause in the circumstances presented here.[6]

Lira's omission was an independent cause that "worsened his condition", *Bosarge, supra* at 1000. It overpowered and nullified the connexity between his back injury and his readdiction. *Voris, supra* at 865. Therefore, although we do not adopt his reasoning, we hold that the ALJ correctly rejected Lira's claim for medical expenses incurred as a result of his readdiction to heroin. The Benefit Review Board erred in applying the statutory presumption of work-relatedness in the face of clear record

---

4. Bludworth strenuously argues that the fact that Lira was addicted to an illegal controlled substance is a critical factor. We are unimpressed by this argument. The same case would be presented here if an employee who was allergic to penicillin intentionally refused to inform his physicians of that fact.

5. As dissenting Appeals Judge Robert Ramsey found, had Lira advised his doctor or hospital personnel that he was a former addict, "the hospital would, in all probability, have avoided the administration of potentially addictive medication. From this I conclude that claimant did nothing to avoid the possibility of readdiction,

but to the contrary, at least passively encouraged it."

6. Bludworth argues that Lira's misrepresentation on his application that he had never received treatment for drug abuse was also an intervening cause. The misrepresentation deprived Bludworth of the opportunity to alert Lira's treating physician of the condition. However, it is not necessary to decide this issue. Lira's intentional failure to inform his doctors that he was a prior addict alone was an intervening cause sufficient to destroy the causal link between the back injury and the subsequent readdiction.

proof to the contrary. The order under review is

REVERSED.

REAVLEY, Circuit Judge, dissenting:

Alphonso Lira came to this employment not as an addict, but as a former addict with low tolerance for pain and a high resistance to drug relief. While working he suffered a bad fall which ruptured an intervertebral disc. A painful operation was performed on him. He told no falsehood to the doctor or to the hospital, but—as could be expected of a person under the same circumstances, according to the medical evidence—he did not volunteer the information of his prior addiction for fear he would be deprived of treatment and relief from excruciating pain. The medication eventually wore down his resistance and he became readdicted. This record establishes conclusively that the readdiction was the natural result of all of the factors, the injury and resulting pain being critical parts of that causation.

Lira did not intervene into that causal chain; he failed to intervene. He did not choose readdiction. He made no deliberate, intentional misrepresentation, contrary to what the panel opinion says and his own remorseful characterization of what he did. He is being faulted for the lack of foresight and knowledge and strength which would have enabled him to intervene and stop the normal treatment for pain. He erred. He grabbed for help and it cost him. But under his circumstances, this was far from unexcused and deliberate misconduct.

I would affirm the order of the Benefits Review Board.