751 F.2d 1460
 STRACHAN SHIPPING CO. and Texas Employers' Insurance
Association, Petitioners,
v.
Earl F. NASH and Director, Office of Workers' Compensation
Programs, United States Dept. of Labor, Respondents.
 No. 83-4332.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 4, 1985.
 
 Steven L. Roberts, Houston, Tex., for petitioners.
 T. Timothy Ryan, Jr., Joshua T. Gillelan, II, Sols. of Labor, U.S. Dept. of Labor, Marianne Demetral Smith, Atty., Dept. of Labor, Washington, D.C., for respondents.
 Stephen M. Vaughan, Houston, Tex., for Earl F. Nash.
 James T. Smith, Asst. Deputy Comm., U.S. Dept. of Labor, Galveston, Tex., Agnes G. Kurtz, Benefits Review Bd., U.S. Dept. of Labor, Washington, D.C., for other interested parties.
 Petition for Review of an Order of the Benefits Review Board.
 Before CLARK, Chief Judge, JOHNSON and WILLIAMS, Circuit Judges:
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 Respondent Earl F. Nash sought benefits under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. Secs. 901-950 (1982), for the permanent partial disability that his right knee sustained during his longshoring work for petitioner Strachan Shipping Company. Two prior injuries had partly disabled the knee, but respondent received compensation only for the second one. The Benefits Review Board adjudged Strachan responsible for the disability that the third and first casualties produced but absolved a statutory "second-injury" fund[1] from liability.
 
 
 2
 Our review obliges us to compute the liability that the LHWCA imposes respectively upon Strachan and the fund.[2] We affirm the determination that the fund owes no compensation. We reverse, however, the holding the Strachan must pay benefits for respondent's pre-existing disability despite his receipt of compensation under the LHWCA for an intervening work accident. After presenting the factual and procedural setting, we dispose of the issues seriatim.
 
 I.
 
 3
 The parties do not dispute the underlying facts. Respondent first damaged his knee in 1969, during his senior year at Ball High School in Galveston, Texas. A fall in shop class shattered his right patella, necessitating its surgical removal. Respondent recovered no compensation for the accident. A medical report that respondent's doctor prepared a decade later indicated that the injury produced twenty percent permanent partial disability to the knee.
 
 
 4
 Respondent's second accident arose in the course of his work as a longshoreman on the Galveston docks for Chaparral Stevedoring Company. On June 19, 1974, a cotton-laden forklift struck respondent's legs. The collision tore the medial meniscus in his right knee. Following unsuccessful conservative treatment, a surgeon excised the cartilage in October 1975. The doctor attributed to the injury an additional ten percent permanent partial disability. A report that another doctor had prepared a few months before the operation estimated the increment of disability at two percent, and a third physician's report in 1979 calculated that the accident had added five percent disability.
 
 
 5
 As the LHWCA required it to do, Chaparral compensated respondent for temporary total and temporary partial disability until March 13, 1976, but the company disputed its obligation to pay benefits for permanent partial disability. After respondent Nash had discussed the matter with the United States Department of Labor, which administers the LHWCA, he and Chaparral settled his claim for additional benefits in April 1976. No lawyer represented him at the time. The "Agreement Regarding Facts" that he and Chaparral's insurance carrier executed recited that the work injury had caused "Permanent Partial Disability equivalent to 10 percent loss...." It did not, however, mention the previous injury. The Office of Workers' Compensation Programs of the Department of Labor received the settlement agreement the following day. The Office acknowledged receipt of the agreement in a letter that stated: "this is your authority to dispose of this matter on payment of compensation as outlined in the Agreement."
 
 
 6
 The injury that generated this suit also occurred on the Galveston waterfront. While part of a work crew handling cotton bales aboard ship on March 16, 1978, respondent fell through a gap between bales, twisting his right knee. His doctor believed that the incident exacerbated his pre-existing disability by three to four percent. Like Chaparral, Strachan paid respondent for temporary total and temporary partial disability in accordance with the LHWCA but disputed any liability for the permanent partial disability of the knee.
 
 
 7
 An administrative law judge (ALJ) initially decided this case. It comes to us following an appeal of that decision to the Department of Labor Benefits Review Board. The ALJ heard testimony and received other evidence the parties presented. He found that respondent's 1969 injury caused twenty percent permanent partial disability to his right knee; the 1974 accident, which the ALJ regarded as compensable under the LHWCA, added ten percent; and the 1978 mishap produced a further four percent. He also found that respondent and Chaparral had settled his claim for permanent partial disability benefits "on the basis of a 10% loss of use of the right leg". The ALJ then determined that the LHWCA required compensation of the entire thirty-four percent. He rested his holding on the extra-statutory "aggravation rule", which provides that an employer must compensate an employee not only for a work injury but also for any pre-existing disability that the injury worsens. See, e.g., Bludworth Shipyard, Inc. v. Lira, 700 F.2d 1046, 1049 (5th Cir.1983) ("We have repeatedly held that an employer takes an employee as he finds him.") The ALJ also found that section 8(f)(1) of the LHWCA, 33 U.S.C. Sec. 908(f)(1) (1982), restricted Strachan's liability to four percent disability, the amount "attributable" to the 1978 accident, and that the second-injury fund owed compensation for the remaining thirty percent. Looking to section 8(c)(2), which specifies 288 weeks as the compensation period for total loss of a leg or its use, and to section 8(c)(19), which allows compensation "for proportionate loss" of a "member" or its use, the ALJ ordered Strachan to pay four percent of respondent's compensation rate[3] for 288 weeks. He also directed the second-injury fund to disburse thirty percent of the compensation rate for the same length of time after Strachan's payments ceased.
 
 
 8
 The Benefits Review Board concluded that legal errors had been made and substantially modified the ALJ's decree. Nash v. Strachan Shipping Co., 15 Ben.Rev.Bd.Serv. (MB) 386 (1983). The Board first reduced the thirty-four percent disability that the ALJ had attributed to the 1978 accident by the ten percent for which respondent had received compensation from Chaparral for the 1974 injury. The Board did not, however, apply this "credit doctrine" to shield Strachan from the twenty percent disability that the 1969 injury generated, and it held Strachan responsible for twenty-four percent.
 
 
 9
 The Board also found legal error in the ALJ's determination that the second-injury fund owed benefits to respondent. It held that the fund operates only after the employer, in accordance with the schedule in section 8(c), has paid benefits for more than 104 weeks. See 33 U.S.C. Sec. 908(f)(1) (1982) (fourth sentence). Sections 8(c)(2) and 8(c)(19), rather than requiring Strachan to pay four percent of the compensation rate for 288 weeks, provide that Strachan must compensate respondent for a period determined by multiplying the percentage of disability and the number of weeks of compensation for total loss of use of a leg. That formula yielded a compensation period of 69.12 weeks (24% of 288 weeks = 69.12 weeks), well short of the 104 weeks that triggers the fund. The Board accordingly ordered Strachan to remit to respondent twenty-four percent of two-thirds of his weekly wage for a period of 69.12 weeks.[4]
 
 
 10
 Strachan timely appealed. The Director of the Department of Labor Office of Workers' Compensation Programs joined respondent in seeking to uphold the Board's decision. Strachan's insurance carrier also participated in the appeal.
 
 II.
 
 11
 We agree with the Board that the second-injury fund incurred no liability to respondent, but we reach that conclusion by a somewhat different route. We start, of course, with the plain words of the statute but resort to other tools of interpretation where ambiguity or absurd results compel us to do so.
 
 
 12
 The relevant provisions appear in sections 8(c) and 8(f). Section 8(c) prescribes the period over which compensation "shall be paid to the employee" for each of several types of bodily disability. The subsection does not state who must pay the compensation, but it provides that the benefits must equal two-thirds of the employee's average weekly wage. Section 8(c)(2), which deals with loss of a leg, specifies a 288-week compensation period. Section 8(c)(19) complements the other section 8(c) provisions, most of which relate to loss of arms, legs, toes, and fingers, by allowing that "[c]ompensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member." Under section 8(c)(19), then, an employee whose work injury caused permanent partial disability to one of his members may collect compensation for a number of weeks equal to the percentage of his disability times the number of weeks that the relevant provision in section 8(c) specifies for total loss of the particular member. Thus, in this case, sections 8(c)(2) and 8(c)(19) together require multiplying the percentage of respondent's disability and 288 weeks to determine the period over which he shall receive two-thirds of his average weekly wage.[5]
 
 
 13
 Section 8(f) governs cases in which the work injury aggravates a previous disability, and it determines who must pay the benefits, the employer or the second-injury fund. The first sentence of section 8(f)(1) provides that "[i]n any case in which an employee having an existing permanent partial disability suffers injury, the employer shall provide compensation for such disability as is found to be attributable to that injury based upon the average weekly wages of the employee at the time of the injury." The LHWCA nowhere defines "attributable", but the fourth sentence of section 8(f)(1) provides guidance as to its meaning in this case:
 
 
 14
 If following an injury falling within the provisions of subdivision (c)(1)-(20) of this section, the employee has a permanent partial disability and the disability is found not to be due solely to that injury, and such disability is materially and substantially greater than that which would have resulted from the subsequent injury alone, the employer shall provide compensation for the applicable period of weeks provided for in that section for the subsequent injury, or for one hundred and four weeks, whichever is the greater.
 
 
 15
 33 U.S.C. Sec. 908(f)(1) (1982). The fourth sentence thus attributes to the subsequent injury either a compensation period that calculations pursuant to section 8(c) prescribe for that injury, or 104 weeks, "whichever is the greater". Section 8(f)(2) requires the second-injury fund to pay "the remainder of the compensation that would be due."
 
 
 16
 We perceive considerable ambiguity in the statutory scheme. If we read it literally, the fourth sentence demands that the employer pay benefits for 104 weeks whenever section 8(c) prescribes compensation for a shorter period.[6] We cannot countenance such a perverse outcome. We accordingly hold that, for situations in which section 8(c) provides for a compensation period less than 104 weeks in second-injury cases, the shorter period controls over the 104 weeks which section 8(f)(1) on its face demands.[7]
 
 
 17
 The legislative history of the 1972 amendments, which added the 104-week provision, supports our construction and indicates the scope of fund liability. The House report characterized the intent underlying the addition as enhancing the employment prospects of handicapped workers by shielding employers from severe costs of compensating employees with prior disabilities:
 
 
 18
 Many employers have an inaccurate impression regarding the liabilities for workmen's compensation when they employ handicapped workers. It is unfortunately a widespread belief that an employer is subjected to burdensome compensation costs where a handicapped worker receives an injury at the new place of employment. The provision in the bill makes clear that the employer's responsibility for the subsequent or second injury is limited to the scheduled award for the second injury or 104 weeks, whichever is greater. The remaining obligation to pay the employee where he is totally or partially disabled will fall upon the special funds existing under Section 44 of the Act. This method of spreading the risk among all employers is intended by the committee to encourage the employment of handicapped workers.
 
 
 19
 H.R.Rep. No. 1441, 92d Cong., 2d Sess. 9, reprinted in 1972 U.S.Code Cong. & Ad.News 4698, 4705-06. The recognition of "burdensome compensation costs" in second-injury cases indicates congressional awareness that the aggravation rule generally requires an employer to take an employee as it finds him.[8] We think Congress intended the amendment to limit employers' liability to 104 weeks in situations where section 8(c) prescribes a shorter compensation period for the subsequent injury alone but the total disability resulting from both injuries requires compensation for more than 104 weeks. An employer, of course, remains liable for the entire amount of disability that the subsequent injury inflicted. In both instances, the second-injury fund would pay the remaining benefits that section 8(c) and the aggravation rule require.[9] The fourth sentence of section 8(f)(1) thus applies only in situations in which the entire disability warrants compensation for more than 104 weeks. It simply does not address cases where section 8(c) requires compensation for fewer than 104 weeks.
 
 
 20
 That conclusion disposes of the fund liability issue. Even assuming that section 8(c) requires compensation for the disability that all three injuries caused, the period of compensation falls short of 104 weeks. Thirty-four percent of 288 weeks equals fewer than 98 weeks. Accordingly, section 8(f)(2) imposed no liability upon the fund.
 
 III.
 
 21
 It remains to assess Strachan's liability. The Board gave Strachan credit for Chaparral's settlement of respondent's 1974 claim but held Strachan liable, under the aggravation rule, for the 1969 disability percentage as well as the 1978 injury percentage. Our inquiry thus focuses on the aggravation rule and the credit doctrine.[10] We must decide the extent to which the latter modifies the former: whether the credit doctrine gives the employer the benefit only of the compensation that the employee actually received for his pre-existing disability or whether it applies more broadly to shield the employer from liability for any previous disability for which the employee could have recovered benefits pursuant to the LHWCA.
 
 
 22
 The purposes of the rule and doctrine contribute to our decision. The aggravation rule reflects a determination that the employee receive an amount sufficient to make him whole, to the extent money can do so. The credit doctrine, on the other hand, exhibits the common law abhorrence of double recoveries. In this case, however, applying the doctrine to prevent respondent from recovering for the disability that stemmed from his 1969 injury would not further the function that the doctrine performs; he has received no compensation for that disability. Thus, if this case involved the second injury, respondent should recover from Strachan for all disability of his knee attributable to the two injuries even though he could not have secured compensation for the first. But he sustained an intervening compensable injury with ten percent disability for which he received compensation under the LHWCA. Under the aggravation rule, the compensation for that injury should have also included benefits for the twenty percent disability making a total of thirty percent for the first two injuries.
 
 
 23
 The structure and function of the LHWCA make that conclusion clear. Congress enacted the statute in 1927 to create an orderly means of compensating longshoremen and similar workers for injuries they sustain in the course of their employment.[11] The original statute allowed a single procedure for recovery of benefits; an employee had to file a claim with the relevant deputy commissioner, who determined the worker's right to compensation and rendered an award. See Longshoremen's and Harbor Workers' Compensation Act, ch. 509, Sec. 13(a), Pub.L. 69-803, 44 Stat. 1424, 1432 (1927) ("Such claim shall be filed with the deputy commissioner in the compensation district in which such injury or such death occurred."); id. Sec. 19(a) (providing that "the deputy commissioner shall have full power and authority to hear and determine all questions in respect of such claim"). The LHWCA also invalidated any "agreement by an employee to waive his right to compensation under this Act," id. Sec. 15(b), making proceedings before the deputy commissioner the exclusive means of obtaining benefits from a reluctant employer.
 
 
 24
 The 1938 and 1972 amendments added provisions allowing for settlement agreements between employers and employees in certain circumstances, but the authorization kept the process within the safeguards of the LHWCA structure. See 33 U.S.C. Sec. 908(i)(A) (1982), as amended by Longshore and Harbor Workers' Compensation Act Amendments of 1984, Sec. 8(f), Pub.L. 98-426, 98 Stat. 1639, 1646 (1984).[12] The new provisions allow settlements discharging an employer from liability for compensation only with the approval of the deputy commissioner, the Board, or a court. See generally H.R.Rep. No. 1441, 92d Cong., 2d Sess. 22, reprinted in 1972 U.S.Code Cong. & Ad.News 4698, 4720. Congress intended the provision to confer "the benefit of finality in the adjustment of the claim...." S.Rep. No. 1988, 75th Cong., 3d Sess. 6 (1938).
 
 
 25
 The comprehensive plan that the LHWCA imposes not only assures but also demands that each employer pay for the full amount of disability that the worker sustained as the result of his injury plus amounts attributable to earlier disabilities. In these second-injury cases, such compensation includes payments for any pre-existing disability, whether compensable or not, up to the limit where the second-injury fund takes over. Allowing a settlement to shift the liability of one employer to another destroys the statutory pattern. That result does not change merely because the Department of Labor approves the settlement. Neither the settlement nor its official approval can shift the burden of compensation to an employer who does not owe it under the statute. Government approval of settlements serves essentially to expedite resolution of factual issues, such as percentage of disability and average weekly wages, without litigation in formal agency proceedings. Settlement approval simply cannot change the provisions of law as they apply to others who did not participate in the settlement.
 
 
 26
 These principles dictate our holding. The legislation protects the worker's right to benefits. Given those safeguards, the injured employee cannot impose any part of the LHWCA liability that one employer owed him upon a subsequent employer. Under the LHWCA, then, the credit doctrine reduces a subsequent employer's liability by the amount that the worker should have recovered from his previous LHWCA employer.[13]
 
 
 27
 In this case, respondent settled his claim against Chaparral for the ten percent disability he incurred to his right knee in 1974. Under the aggravation rule, it is clear that Chaparral also owed him benefits for the twenty percent disability attributable to his 1969 shop accident. The settlement must be considered as terminating his right to secure benefits from a subsequent LHWCA employer for the thirty percent disability for which he could have recovered compensation in 1974. Accordingly, we find that Strachan's liability extends only to the four percent permanent partial disability that arose from respondent's longshoring work injury with Strachan in 1978. Under sections 8(c)(2) and 8(c)(19), Strachan owes compensation for 11.52 weeks (four percent of 288 weeks) at two-thirds of respondent's weekly wages at the time of his 1978 injury.
 
 IV.
 
 28
 In summary, we affirm the Board's determination that the second-injury fund bears no liability to respondent. We reverse its holding that Strachan must compensate for the twenty percent disability that respondent suffered from his 1969 injury. We affirm the Board's crediting Strachan for the ten percent disability that Chaparral compensated in settling respondent's 1974 claim. We remand the case to the Board for proceedings in accordance with this opinion.
 
 
 29
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 JOHNSON, Circuit Judge, dissenting:
 
 30
 This case deals with the Benefit Review Board's (BRB) interpretation of the aggravation rule and the credit doctrine. The aggravation rule requires an employer to compensate an employee for the full extent of the employee's disability, including any preexisting disability that the work-related injury worsens.[1] The credit doctrine modifies the aggravation rule. The credit doctrine, created by the BRB in interpreting the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. Secs. 901-50, aims at avoiding double recoveries by holding that the employer is not liable for a portion of the employee's disability if that employee has already received compensation under the LHWCA for a previous disability. In keeping with its policy of avoiding double recoveries, the BRB's interpretation of the credit doctrine limits the employer's credit to the percentage actually compensated by a previous employer. Nash v. Strachan Shipping Co., 15 Ben.Rev.Bd.Serv. (MB) 386 (1983).
 
 
 31
 In the instant case, the majority extends the credit doctrine "to shield the employer from liability for any previous disability for which the employee could have recovered benefits [from a previous employer] pursuant to the LHWCA." Maj. op. at 1466. Since the majority's analysis is supported by neither the statutory language nor the policy of the LHWCA, this dissent is respectfully submitted.
 
 I. FACTS AND THE MAJORITY'S ANALYSIS
 
 32
 Nash, the employee, first sustained an injury to his right knee in 1969 while he was a high school student. This 1969 injury resulted in twenty percent permanent partial disability. In 1974, Nash, the employee, injured the right knee again while working for Chaparral Stevedoring Company (Chaparral). This injury resulted in an additional ten percent disability to the right knee. Under the aggravation rule, Nash was entitled at that time to receive compensation for his disability from both the 1974 Chaparral injury (ten percent) and the previously existing 1969 high school accident (twenty percent)--a total of thirty percent disability.[2] Instead of pursuing such a remedy (for a thirty percent recovery), Nash entered into an "Agreement Regarding Facts" with Chaparral. This agreement recited that Nash's work injury with Chaparral had caused permanent partial disability "equivalent to 10 percent loss." This agreement between Chaparral and Nash made no mention of the initial 1969 high school shop accident.[3] In 1978, Nash received an injury resulting in an additional four percent disability while working for Strachan Shipping Co. (Strachan). Following this third injury, Nash sought compensation for his full thirty-four percent disability. The BRB, applying its interpretation of the credit doctrine, subtracted ten percent for the percentage compensation Nash had actually received from Chaparral; the BRB left Nash with compensation for twenty-four percent disability for which he had received no compensation.
 
 
 33
 On petition for review to this Court by Strachan Shipping Co. and its insurer, the majority holds Nash may recover only the four percent disability he sustained as a result of his injury while working for Strachan. The majority asserts that Chaparral was liable for both the additional 1974 injury (ten percent) and the original 1969 injury (twenty percent) under the aggravation rule and that statutory safeguards aim at assuring that each settlement fully compensates the employee. From these assertions, the majority concludes that the statutory pattern of the LHWCA implicitly prohibits an employee from shifting the liability for the original 1969 twenty percent disability from the previous employer (i.e., Chaparral) to a later employer (i.e., Strachan). The result of the majority's reasoning is that any liability for the original 1969 injury was terminated when Nash accepted the compensation benefits for ten percent disability from Chaparral.
 
 II. POLICY AND INTERPRETATION OF THE LHWCA
 
 34
 In providing the employee with a single full recovery for twenty-four percent compensation, the BRB acted consistently with the policy of the LHWCA and this Court's interpretation of that statute. On the other hand, the majority's analysis, in denying the employee a full recovery, limits employee recovery under the LHWCA without statutory foundation. The majority's limitation is contrary to both the interpretation and policy of the LHWCA.
 
 A. The BRB's Analysis
 
 35
 The LHWCA, a workmen's compensation statute, represents a compromise by which the employee receives a smaller recovery than he might receive in a common law action but one in which the employee's statutory compensation is more immediate and secure while less expensive. Bludworth, 700 F.2d at 1051. In interpreting this statute, which aims at compensation, this Court has held that ambiguities in the statute should be resolved in favor of recovery by the longshoreman. See Baltimore & Philadelphia Steamboat Co. v. Norton, 284 U.S. 408, 414, 52 S.Ct. 187, 189, 76 L.Ed. 366 (1932); Bludworth, 700 F.2d at 1051; United Brands Co. v. Melson, 594 F.2d 1068 (5th Cir.1979). The aggravation rule, as applied by the BRB in the instant case, rests on the same "presumption of compensability grounded in the humanitarian nature of the [LHWCA]." Newport News Shipbuilding & Dry Dock Co. v. Fishel, 694 F.2d 327, 329 (4th Cir.1982). Indeed, by requiring that an employer provide full compensation to the employee, even though a substantial portion of the disability may be due to a previous injury, the aggravation rule assures a recovery that furthers the employee's rehabilitation. Cf. Bludworth, 700 F.2d at 1051 (LHWCA intended "to rehabilitate injured workers so that they might become productive members of society"). In its interpretation of the LHWCA in the instant case, the BRB assured such a recovery by providing a single full recovery to Nash. There is no claim by either Strachan or the majority, nor can there be, that the BRB's decision in the instant case resulted in any double recovery to Nash. In providing a single complete recovery, the BRB's interpretation of the aggravation rule and the credit doctrine is consistent with the recognized purpose of the LHWCA in providing the employee with complete recovery and with the presumption of compensability grounded in the LHWCA. At the same time, the BRB's interpretation avoids the common law's abhorrence of double recoveries by subtracting the percentage of disability which has been actually compensated previously. Thus, the BRB's interpretation accomodates both the purposes of the statute and the common law's abhorrence of double recovery.
 
 B. The Majority's Analysis
 
 36
 The majority reasons that the BRB's interpretation of the aggravation rule and the credit doctrine is contrary to the statutory pattern of the LHWCA. The majority discerns this pattern by noting that statutory safeguards aim at assuring that the employer pays for the full amount of compensation to which the employee is entitled. Given these safeguards, the majority concludes that the LHWCA implies that no part of the compensation that a previous employer owed the injured employee may be shifted to a subsequent employer. Maj. op. at 1467. The safeguards upon which the majority relies, however, aim at assuring that the employer pay the full amount of disability, not at assigning liability to one particular employer.[4] Nor is it evident why the safeguards relied upon by the majority, which aim at assuring the employee full compensation, should be later used to deny full compensation when the safeguards fail to provide full recovery after the first compensable injury (as the safeguards failed to do in the instant case).
 
 
 37
 Moreover, implying a limitation cuts against this Court's previous interpretation of the LHWCA. As noted above, this Court has held that ambiguities in this statute should be resolved in the favor of recovery by the longshoreman. Bludworth, 700 F.2d at 1051; Melson, 594 F.2d at 1075. In Melson, for instance, this Court refused to allow any credit for state compensation actually received by an employee for an injury also compensable under the LHWCA. Although the result of the Melson case has been reversed by statute, see Longshore and Harbor Workers' Compensation Act Amendments of 1984, Sec. 3(b), Pub.L. 98-426, 98 Stat. 1639, 1641 (1984), amending 33 U.S.C. Sec. 903, Melson demonstrates this Court's policy that the LHWCA is to be liberally construed in favor of injured employees.[5] See also New Orleans (Gulfwide) Stevedores v. Turner, 661 F.2d 1031, 1038 (5th Cir.1981); Hensley v. Washington Metropolitan Area Transit Authority, 655 F.2d 264 (D.C.Cir.1981), cert. denied, 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed.2d 160 (1982). The majority in the instant case reverses that presumption by implying a limitation without a statutory foundation.
 
 
 38
 Indeed, the amendment adopted in response to Melson, although not literally applicable since the amendment applies to compensation received under state systems or under the Jones Act, indicates a statutory pattern that implies the credit doctrine should extend only to amounts actually compensated for previous disabilities. The new section 3(e) of the LHWCA provides:
 
 
 39
 (e) Notwithstanding any other provision of law, any amounts paid to an employee for the same injury, disability, or death for which benefits are claimed under this Act pursuant to any other workers' compensation law or [to the Jones Act] ... shall be credited against any liability imposed by this Act.
 
 
 40
 Longshore and Harbor Workers' Compensation Act Amendments of 1984, Sec. 3(b), 98 Stat. at 1461, amending 33 U.S.C. Sec. 903 (emphasis added). The amendments, like the credit doctrine as applied by the BRB, credits the employer only for amounts actually paid to the employee.[6]
 
 
 41
 Further, other courts have refused to limit the aggravation doctrine. In Fishel, the employee, who had previously been employed as a "burner" in noisy work environments, had already sustained a 25.3 percent binaural hearing loss at the time of his employment in 1971 with Newport News Shipbuilding and Dry Dock Co. (Newport News). In 1979, after seven years on the job, the claimant sought recovery for his full 31.25 percent binaural hearing loss. Although Newport News argued that it should be liable only for the increased disability occurring during the time of Fishel's employment with Newport News, the Fourth Circuit affirmed the BRB's award of the full 31.25 percent compensation to be paid by Newport News. In doing so, the Fourth Circuit noted that Congress had rejected attempts by employers to limit the aggravation doctrine. Particularly, the court stated:
 
 
 42
 By refusing to include the proposed clause, or any provision which would have suggested an intent to limit an employer's liability under the circumstances presented here, Congress clearly implied that it did not intend to force longshoremen and harbor workers to seek compensation from every employer whose employment may have contributed to a particular disability. We too decline to establish such a rule and, therefore, hold that Newport News must compensate Chester Fishel for the entire 31.25% of his hearing loss.
 
 
 43
 694 F.2d at 330 (emphasis added). In the same way, this Court should not imply a limitation on the aggravation rule requiring the employee either to seek full compensation from every employer or to thereafter forfeit recovery on a substantial portion of his disability.
 
 
 44
 Finally, the credit doctrine, as it is offered by the BRB, asks not what was "compensable" at the time of the previous injury but instead what compensation the employee has actually received for the preexisting part of the impairment. The only relevant question in the BRB's analysis is what compensation the worker has actually received for the disability to the member in question. Strachan and the majority, by measuring the credit doctrine according to what was earlier compensable, require a determination of what amount of injury existed in the past, prior to the injury with the employer from whom compensation is sought. Dividing a worker's impairment and asking what injury was earlier compensable often will be a difficult task requiring litigation of issues previously sought to be settled.[7] The BRB's interpretation of the credit doctrine, on the other hand, asks only what percentage of impairment was actually compensated and provides both greater administrative certainty and settlements with finality.[8]
 
 
 45
 The BRB's result may seem inequitable in some instances in that it might impose liability on an employer even though the worker did not incur the greater part of his disability with that employer. However, even in those cases in which such a result obtains, it is no more inequitable than the aggravation rule itself, which makes an employer liable for the employee's complete disability. As noted by this Court, "an employer takes an employee as he finds him." Bludworth, 700 F.2d at 1049. Congress has created its own mechanism, the second-injury fund, to mitigate any harshness from the aggravation rule.
 
 III. Conclusion
 
 46
 The aggravation rule, well established in the interpretation of the LHWCA, is curtailed in the instant case without justification and without statutory authority. If the aggravation rule is to be modified, the Congress alone is the proper forum for such action. I respectfully dissent.
 
 
 
 [1]
 Section 44 of the LHWCA, 33 U.S.C. Sec. 944 (1982), authorizes the fund and provides for assessments from members of the industries that the LHWCA covers
 
 
 [2]
 We may correct the Board's errors of law. E.g., Alford v. Am. Bridge Div., 642 F.2d 807, 809 (5th Cir.1981), cert. denied, 455 U.S. 927, 102 S.Ct. 1292, 71 L.Ed.2d 472 (1982). Because the Board does not make policy, we accord no special deference to its interpretation of the LHWCA. Potomac Elec. Power Co. v. Director, Office of Workers' Comp. Programs, 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446, 454 n. 18 (1980); Alford, 642 F.2d at 809
 
 
 [3]
 The LHWCA specifies a compensation rate equal to two-thirds of the worker's weekly wage at the time of his injury in cases involving permanent partial disability. 33 U.S.C. Sec. 908(c) (1982). The ALJ found that respondent earned an average weekly wage of $451.34 when he sustained his 1978 injury
 
 
 [4]
 Chief Administrative Appeals Judge Ramsey dissented because he believed respondent could not recover from Strachan for his 1969 injury. He felt that the settlement with Chaparral terminated respondent's right to such compensation and that "[i]t is inappropriate for the Board to correct any errors in [respondent's] prior settlement with Chaparral by now assessing Strachan for an additional amount of compensation." Nash v. Strachan Shipping Co, 15 Ben.Rev.Bd.Serv. (MB) 386, 397 (1983)
 
 
 [5]
 The Board employed this method of calculating the extent of an employee's entitlement to compensation for a work injury that partially disables one of his members. We see no grounds for disagreeing with it. Cf. Potomac Elec. Power Co. v. Director, 449 U.S. at 271 n. 4, 101 S.Ct. at 511 n. 4 (Under Sec. 8(c)(19), a claimant who suffered permanent partial disability to his knee "is ... entitled to receive two-thirds of his average weekly wages for whatever fraction of 288 weeks represents the proportionate loss of the use of his leg caused by the knee injury.") (dictum)
 
 
 [6]
 An example illustrates the dilemma. Section 8(c)(12) prescribes a fifteen-week compensation period for loss of the little finger. If an employee with a pre-existing disability of ten percent to that finger suffers a work injury that totally disables the digit, he could recover under that section only for fifteen weeks. A literal reading of section 8(f)(1), however, would require compensation for 104 weeks because that number "is ... greater" than fifteen
 
 
 [7]
 The Fourth Circuit reached the same conclusion in Newport News Shipbuilding and Dry Dock Co. v. Fishel, 694 F.2d 327, 329 (1982)
 
 
 [8]
 See, e.g., Am. Bridge Div. v. Director, Office of Workers' Comp. Programs, 679 F.2d 81, 82 n. 3 (5th Cir.1982); Maryland Shipbuilding and Drydock Co. v. Director, OWCP, 618 F.2d 1082, 1084 (4th Cir.1980) ("Section 8(f) is intended to encourage the employment of handicapped workers, by protecting an employer who hires a handicapped worker from paying total disability compensation for an injury that would have been a partial disability but for pre-existing conditions."); C & P Tel. Co. v. Director, OWCP, 564 F.2d 503, 512 (D.C.Cir.1977) ("Thus the purpose of new Sec. 8(f) is to prevent discrimination against handicapped workers in hiring and firing, a discrimination encouraged by the remainder of the Act were it not for Sec. 8(f).")
 
 
 [9]
 Two illustrations clarify the matter. In the first situation, an employee with a pre-existing disability of 25% to one of his arms suffers a work injury that adds 60% disability. Section 8(c)(1) prescribes a 312-week compensation period for total loss of an arm. As we read Sec. 8(f), the employer would owe benefits for 60% of 312 weeks, or 187.2 weeks, and the second-injury fund would disburse payments for 78 weeks (25% of 312 weeks). In the second scenario, the worker's injury increases his pre-existing disability of 60% by 25%. Section 8(f) would then impose on the employer liability for only 104 weeks because that number exceeds the compensation period that Sec. 8(c) prescribes for the second injury alone. The fund would thus take responsibility for benefits beyond 104 weeks, or 161.2 weeks
 
 
 [10]
 We have consistently applied the aggravation rule in LHWCA cases. See Bludworth Shipyard, Inc. v. Lira, 700 F.2d 1046, 1049 (5th Cir.1983); Fulks v. Avondale Shipyards, Inc., 637 F.2d 1008, 1012 (5th Cir.1981), cert. denied, 454 U.S. 1080, 102 S.Ct. 633, 70 L.Ed.2d 613 (1981); Equitable Equipment Co. v. Hardy, 558 F.2d 1192, 1195 (5th Cir.1977); Cooper Stevedoring of Louisiana v. Washington, 556 F.2d 268, 271 (5th Cir.1977). We have not, however, had occasion to apply the credit doctrine, although it is an established rule of the Benefits Review Board. See Nash v. Strachan Shipping Co., 15 Ben.Rev.Bd.Serv. (MB) at 391; Bracey v. John T. Clark & Son of Maryland, 12 Ben.Rev.Bd.Serv. (MB) 110, 112 (1980); Scurlock v. Parr-Richmond Terminal Co., 6 Ben.Rev.Bd.Serv. (MB) 634, 640 (1977); Lopez v. Atlantic Container Lines, 2 Ben.Rev.Bd.Serv. (MB) 265, 270 (1975) (dictum). United Brands Co. v. Melson, 594 F.2d 1068, 1074-75 (5th Cir.1979), refusing to credit settlement of a state worker's compensation claim against LHWCA liability, is no longer the law. See infra note 13
 
 
 [11]
 The legislation struck a balance between the interests of employers and workers: it assured compensation regardless of the employers' fault but limited the amount workers could recover. See, e.g., Voisin v. O.D.E.C.O. Drilling Co., 744 F.2d 1174, 1176 (5th Cir.1984)
 
 
 [12]
 The amendment of Sec. 8(i)(A) does not affect the outcome in this case. In any event, the change merely liberalizes and prescribes further procedures for approving settlements of LHWCA claims
 
 
 [13]
 We emphasize that our holding applies only to cases in which an employer claims credit for a worker's pre-existing disability for which the LHWCA required compensation from a previous employer. It does not extend to credit for workers' tort claims against third parties as express statutory provisions govern that situation. See 33 U.S.C. Sec. 933 (1982), as amended by Longshore and Harbor Workers' Compensation Act Amendments of 1984, Sec. 21, Pub.L. No. 98-426, 98 Stat. 1639, 1652 (1984)
 A recent amendment to Sec. 3 requires credit for "any amounts paid" pursuant to state and other federal workers' compensation laws and thus overrules our decision in Melson, see supra note 10. See LHWCA Amendments of 1984, Sec. 3(e), 98 Stat. at 1641, amending 33 U.S.C. Sec. 903 (1982). The new provision, in applying to compensation that an employee secured outside the LHWCA structure, broadens the credit doctrine beyond the scope of its application in this case, where the earlier compensation was under the LHWCA.
 
 
 [1]
 The aggravation rule is a well established part of Congress's plan to compensate employee disability under the LHWCA. See, e.g., Bludworth Shipyard, Inc. v. Lira, 700 F.2d 1046, 1049 (5th Cir.1983)
 
 
 [2]
 The percentages of disability are drawn from the administrative law judge's (ALJ's) findings in the instant case. These estimates were based on doctors' reports prepared up to ten years after the injury in question occurred. See maj. op. at 1462
 
 
 [3]
 At the time Nash entered into the Agreement Regarding Facts with Chaparral, Nash was not represented by an attorney. One reason Nash may have compromised his claim is that medical estimates of his disability as a result of the Chaparral injury ranged from two to ten percent. See maj. op. at 1462
 
 
 [4]
 The majority argues, "Neither the settlement nor its official approval can shift the burden of compensation to an employer who does not owe it under the statute." Maj. op. at 1467. This analysis, however, assumes the answer to the question at hand since it is clear that but for the Chaparral injury, Strachan would be liable for the portion of disability resulting from the 1969 injury
 
 
 [5]
 In Melson, the Court noted:
 United Brands has not been prejudiced by Melson's recovery from the state system. Under the [LHWCA], United Brands is fully liable for Melson's injury. Melson's recovery from McKnight [under the state compensation system] is a mere fortuity. To allow United Brands a set-off is to give United Brands a windfall in the amount of Melson's state award. Until Congress is moved by this unusual situation, we think that the solution to this difficult problem is to allow the windfall of double recovery to reside with the injured worker rather than allow the set-off windfall to accrue to United Brands.
 Melson, 594 F.2d at 1075. In the same way, Nash's previous recovery from Chaparral in no way prejudiced Strachan and likewise is a mere fortuity. The BRB's interpretation of the credit doctrine in the instant case, of course, avoids the double recovery which led to the congressional action, which provides the employer with a set-off for the amount actually awarded an employee through state compensation systems. See infra, at 1464.
 
 
 [6]
 The BRB's analysis differs slightly in that it credits the employer for the percentage previously compensated while the amendments credit the amount previously compensated
 
 
 [7]
 The range of disability estimates after Nash's injury with Chaparral, for instance, ranged from two to ten percent. Maj. op. at 1462. Indeed, one rationale for the aggravation rule is the difficulty and inherent arbitrariness in dividing an employee's impairment by how much disability each previous injury caused. See Fishel, 694 F.2d at 329
 
 
 [8]
 Thus, the BRB's interpretation again is consistent with the policy of the LHWCA in promoting fast and inexpensive compensation for the worker and in rendering settlements final